Amber TOKARCIK, a minor by Nileleen N. Tokarcik, her parent and natural guardian, and Michael G. Tokarcik, and Nileleen N. Tokarcik, Appellees,

v.

FOREST HILLS SCHOOL DISTRICT, Robert L. Beyer, Secretary, and Dr. Warren E. Howard, individually and as Supt. of Forest Hills School District and Pennsylvania Department of Education, Dr. Robert Scanlon, Secretary of Education of the Commonwealth of Pa.

Appeal of FOREST HILLS SCHOOL DISTRICT, Robert L. Beyer and Robert Anderson, in 80–2844.

Appeal of PENNSYLVANIA DEPART-MENT OF EDUCATION and Robert G. Scanlon, Secretary of Education, in 80–2845.

Nos. 80–2844/5.

United States Court of Appeals, Third Circuit.

Argued May 18, 1981.

Decided Sept. 8, 1981.

Rehearing and Rehearing In Banc Denied Oct. 2, 1981.

Gilbert E. Caroff (argued), Johnstown, Pa., for appellants Forest Hills School Dist., Robert L. Beyer, and Robert Anderson.

Ernest N. Helling (argued), Asst. Atty. Gen., Michael A. Davis, Asst. Atty. Gen., Chief Counsel, Mary Kay Kisthardt, Deputy Atty. Gen., Harrisburg, Pa., for appellants Pennsylvania Dept. of Ed. and Robert G. Scanlon.

Edward R. Schellhammer, John D. Gibson, Stephen E. DiNovis, Southern Alleghenys Legal Aid, Inc., Johnstown, Pa., for appellees.

William Fearen, Michael I. Levin (argued), Cleckner & Fearen, Harrisburg, Pa., for amicus curiae, Pa. School Boards Ass'n.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

We are once again asked to define the rights of handicapped school children and the obligations of school districts, as well as the roles of courts and agencies, under the Education for All Handicapped Children Act, 20 U.S.C. § 1401 et seq. [hereinafter EAHCA].[1] First, however, it is necessary to decide if an appealable order exists. If so, we must ascertain whether the plaintiffs' claim is timely filed. Once these threshold requirements are satisfied, we are required to determine whether clean intermittent catheterization falls within the statutory definition of "related services" that a school district must provide a handicapped child.

### I.

Plaintiff-appellee, Amber Tokarcik, is currently a fourth-grade student in the Forest Hills School District in Cambria County. She was born with spina-bifida, a congenital physical defect, and is paralyzed from the waist down. Because Amber's condition prevents her from emptying her bladder voluntarily, intermittent catheterization is necessary approximately every four hours. In 1976, when Amber entered kin-

---

1. In two earlier cases, we held that a profoundly retarded child had a right to residential placement under the EAHCA, see Kruelle v. New Castle County School District, 642 F.2d 687 (3d Cir. 1981), and that the 180 school-day rule applicable to nonhandicapped children was inappropriate for the unique needs of the handicapped. See Battle v. Commonwealth of Pennsylvania, 629 F.2d 269 (3d Cir. 1980), cert. denied 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981).

dergarten in the regular public school program, her parents, also appellees in this suit, requested the school personnel to perform the necessary catheterization once a day. The Forest Hills School District refused to provide the service. Consequently, some member of Amber's family has gone to the school each day to catheterize. Amber has no mental deficiencies and her educational performance is normal for a child her age.

Prior to the 1977–78 school year, Amber's parents and the school staff attempted to agree upon an appropriate individualized educational program (IEP) for Amber in conformity with the EAHCA, see 20 U.S.C. § 1401(19). Consensus appears to have been reached concerning special transportation to and from school, and an adaptive physical education program. But the continuing impasse over the provision of the clean intermittent catheterization (CIC) services led Amber's parents to request a due process hearing, as provided in the Act. 20 U.S.C. § 1415(b)(2). At the hearing, the school district contended that Pennsylvania law does not require school nurses to catheterize students. Thus, unless a member of Amber's family came to the school to perform the CIC, the district would have to provide Amber with a "special educational placement," 20 U.S.C. § 1401(16), most likely at her home with a tutor. In contrast, Amber's parents presented the testimony of Dr. Lynch, Director of the Bureau of Children's Services in the Pennsylvania Department of Health, who maintained that catheterization is no longer considered a surgical procedure and that the general duties of school nurses would include CIC. The local hearing examiner declared that the school district was not legally required to perform the catheterization services. On appeal, Dr. Kline, then Secretary of Education, upheld the findings and opinion of the local examiner in a decision dated December 22, 1978.

Having exhausted their administrative remedies, the Tokarciks brought suit in the district court against the Forest Hills School District, its secretary and superintendent, the Pennsylvania Department of Education and its Secretary, Dr. Scanlon [hereinafter collectively appellants or school authorities], alleging violations of 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the EAHCA, 20 U.S.C. § 1401 et seq. They requested provision of catheterization for Amber and compensatory and punitive damages. In a memorandum opinion and order of May 19, 1980, the district judge dismissed the § 1983 and Rehabilitation Act claims against the Department of Education as well as the § 1983 damages claim against Secretary Scanlon. No appeal was taken from that order, and the parties proceeded with cross motions for summary judgment on the EAHCA claims.[2]

The trial judge, relying exclusively on the administrative record and an additional set of stipulations, granted plaintiffs' motion for summary judgment. The court directed the school authorities to provide CIC services for Amber as long as she remains a student in the Forest Hills district and is in need of such services. In reaching this result, the district court first held that the court action contemplated by the EAHCA was clearly in the nature of a de novo proceeding and not an appeal from an agency decision. Although the complaint had not been filed within the 30 day statutory limit for appeals from administrative determinations, the district court considered that the suit was nevertheless timely under either the two-year or six-year limitations statutes which govern virtually all actions in Pennsylvania.

On the merits, the district judge believed that Tatro v. State of Texas, 625 F.2d 557

---

2. The district court opinion of May 19, 1980 held that although a private cause of action existed under the Rehabilitation Act, the action against the State Department of Education was barred by the Eleventh Amendment. It also dismissed the § 1983 cause of action against the Department because the Department was not a person within the meaning of 42 U.S.C.

§ 1983. Further, it held that to the extent the complaint seeks damages from Secretary of Education Scanlon without any allegations of his personal involvement, it must be dismissed. App. 38–42. These claims are not presently before us and we express no opinion regarding their merits.

(5th Cir. 1980), controlled the present case. Crediting the Tokarcik's expert Dr. Lynch, who testified that school nurses were qualified to perform catheterization, the court concluded that the provision of CIC would require only a few minutes a day and at most a minimal expenditure of funds. Further, the alternatives to providing CIC—either placement in a special class for the handicapped or at-home instruction—were much more expensive and would violate the mainstreaming principles embodied in the EAHCA.[3] The court thus held that CIC fell within the meaning of a "related service" under the Act, specifically either a "supportive service," as defined in § 1401(17), or a "school health service," as explained in 34 C.F.R. 300.13(a). The trial judge reserved the question of damages and attorney's fees for a later date, and directed further briefing on those aspects of the case by the parties. We affirm.

## II.

Before reaching the merits of the case, two hurdles to our ability to hear the present appeal must be surmounted. First, does a final order exist and, if not, is there an interlocutory order over which we can exercise jurisdiction? Both parties initially maintained that the district court's decision of October 31, 1980 was a final order, appealable under 28 U.S.C. § 1291. Scrutiny of the record, however, reveals that the district court directed the appellants to provide Amber Tokarcik with CIC but did not rule on plaintiffs' claims for damages and attorney's fees. App. 52. Thus, the decision of the district court did not dispose of the entire case, and consequently the judgment was not final within the meaning of § 1291. *See Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (a grant of partial summary judgment limited to the issue of liability is by its terms interlocutory and not

final within meaning of § 1291); *Fireman's Fund Insurance Co. v. Joseph J. Biafore, Inc.,* 526 F.2d 170 (3d Cir. 1975) (district court order which did not resolve damages claim not appealable under 28 U.S.C. § 1291).

 Although litigation with respect to the entire judicial unit has not terminated, Congress, since 1891, has excepted from the finality rule a group of interlocutory orders of an equitable nature. Now codified at 28 U.S.C. § 1292(a), subsection (1) permits appeal from orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to modify or dissolve injunctions . . . ." Because the district court, in partially granting plaintiffs' motion for summary judgment, ordered the school district to provide CIC for the duration of Amber's special education program, we hold that we have appellate jurisdiction to review this interlocutory decision under 28 U.S.C. § 1292(a)(1). An injunction that does not cover all the legal relief a plaintiff seeks is nevertheless a coercive order from which Congress has granted litigants a right to immediate appellate review. *See N.L.R.B. v. Interstate Dress Carriers, Inc.,* 610 F.2d 99, 104 (3d Cir. 1979).

Recently, the Supreme Court reiterated that "we have construed the statute narrowly to ensure that appeal as of right under § 1292(a)(1) will be available only in circumstances where an appeal will further the statutory purpose of 'permitting litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence.'" *See Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981) *quoting Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955). Yet this language neither alters the congressional directive and policy nor undermines the result we reach here. *Carson*

---

**3.** Mainstreaming is the congressionally-approved policy of educating the handicapped, to the maximum extent appropriate, with their nonhandicapped peers. If placement in a regular classroom proves infeasible, the "least restrictive environment" concept governs imple-

mentation of the congressional goal of providing the handicapped an equal educational opportunity. *See* S.Rep.No.94–168, 94th Cong., 1st Sess. *reprinted in* [1975] U.S.Code Cong. & Admin.News 1430, 1432, 1457.

itself held that an interlocutory order of a district court denying a joint motion by parties in a Title VII suit to enter a consent decree containing injunctive relief was an appealable order. In requiring that a litigant demonstrate that an interlocutory order might have a "serious, perhaps irreparable, consequence" and could be challenged only by immediate appeal, the Supreme Court did not cut back the statutory scope of § 1292(a)(1). Rather, the Court sought to distinguish pretrial procedural orders that had the practical effect of refusing an injunction and could be effectually challenged only at that moment, from procedural orders that did not pose irreparable consequences and could be effectively reviewed on appeal from final judgment. *Compare Carson, supra* (refusal to enter consent decree containing injunctive relief appealable under § 1292(a)(1)) *with Switzerland Cheese Association, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966) (denial of motion for summary judgment requesting permanent but no preliminary injunctive relief not appealable under § 1292). When interlocutory orders do not irrevocably affect the merits of the controversy, the Court, in fear of bringing a flood of pretrial orders within the § 1292 exception, has been reluctant to compromise the congressional policy against piecemeal appeals. *See Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 482, 98 S.Ct. 2451, 2454, 57 L.Ed.2d 364 (1978) (order denying class certification held not appealable under § 1292).

Notwithstanding the *Carson* qualification that interlocutory orders pose "serious perhaps irreparable consequences," the appealability of a routine interlocutory injunctive order remains unquestioned.[4] Here, the district court directed straightforward injunctive relief which went to the merits of the dispute. And defendants claim irreparable harm insofar as this additional responsibility to furnish what they regard as medical services will diminish their ability to fulfill what is more appropriately within their domain and expertise—the education needs of handicapped children. Consequently, appellate jurisdiction in conformity with 28 U.S.C. § 1292(a)(1) exists.

### III.

■ Appellants interpose a second obstacle, a statute of limitations defense, to our consideration of the merits of the dispute. The school authorities contend that the district court erred in applying either a two-year or six-year statute of limitations period to the plaintiff's judicial cause of action under the EAHCA. They argue that under the Act aggrieved parties can seek judicial redress only from decisions of a state educational agency.[5] 20 U.S.C. § 1415(e). Accordingly, appellants claim that the plaintiffs' action can be construed in only two ways: as an appeal from an administrative determination or as an appellate action "in the nature of a *de novo* proceeding." In either case, the school authorities maintain, the relevant state limitations period, which should likewise apply in federal court, is 30 days. *See* 42 Pa.Cons.Stat.Ann., § 5571(b) (Purdon Supp.1981); *cf.* 47 Pa.Stat.Ann., § 4–464 (Purdon Supp.1980–81); 75 Pa.Stat.

---

4. *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955), explained the judicial interpretation of § 1292 as follows:

> The appealability of routine interlocutory injunctive orders raised few questions. (cite) There the statute was clear. It was when stays of proceedings, in distinction to injunctions, were appealed that the issue of jurisdiction became sharp.

348 U.S. at 182, 75 S.Ct. at 252. *Carson* relied on, rather than overruled *Bodinger*.

5. There is of course no need to exhaust administrative remedies provided in the Education Act where it would be a futile gesture, *see*

*Armstrong v. Kline*, 476 F.Supp. 583, 587 (E.D. Pa.1979) *remanded on other grounds, Battle v. Com. of Pa.*, 629 F.2d 269 (3d Cir. 1980); *Loughran v. Flanders*, 470 F.Supp. 110, 112 (D.Ct.1979), or where the administrative remedies available do not provide plaintiffs with an adequate forum for securing redress of their grievances. *See Monahan v. State of Nebraska*, 645 F.2d 592, 597 (8th Cir. 1981); *Riley v. Ambach*, 509 F.Supp. 1222 (S.D.N.Y.1980), *rev'd* 668 F.2d 635 (2d Cir. 1981) (disagreeing with district court that exhaustion in this instance would inevitably prove futile).

Ann., § 1550(a) (Purdon Supp.1980–81); 42 Pa.Cons.Stat.Ann., § 5105 (Purdon Supp. 1981). Because plaintiffs initiated suit in the district court on March 14, 1979, nearly 90 days after Secretary Kline issued the order that they challenge, the appellants claim that the action is barred as untimely filed.

No general statute of limitations governs litigation in federal courts. Moreover, Congress, in creating a federal right, often does not provide a time limit for enforcement of that right. The limitations period for commencing actions under federal legislation has consequently been left largely to judicial implication. From early on it was assumed that in the absence of an explicit congressional declaration, the Rules of Decision Act[6] mandated the application of the statute of limitations of the forum state. *See McCluny v. Silliman,* 28 U.S. (3 Pet.) 270, 7 L.Ed. 676 (1830); *Campbell v. Haverhill,* 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895). To effectuate the presumed congressional intent "that the remedy [for federal rights] should be enforced in the manner common to like actions within the same jurisdiction," 155 U.S. at 616, 15 S.Ct. at 219, federal courts were required to characterize the essential nature of the federal claim in terms of the format which the various state statutes of limitations establish. *See Davis v. United States Steel Supply, Etc.,* 581 F.2d 335, 337 (3d Cir. 1978); *Polite v. Diehl,* 507 F.2d 119, 122 (3d Cir. 1974) (en banc). But resort to state statutes was not to be mechanical, in disregard of the impact of local laws on federal objectives. In the words of Justice Frankfurter, "The implied absorption of State statutes of limitation within the interstices of the federal enactments is a phase of fashioning remedial details where Congress has not

spoken but left matters for judicial determination within the general framework of familiar legal principles." *Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).

The present case involves such a federally-created right accompanied by congressional silence regarding the limitations period. Nor does the legislative history evince any specific consideration of a time period for filing a civil action under 20 U.S.C. § 1415(e)(2). *See* S.Rep.No.94–455 (Conference Committee) 94th Cong., 1st Sess. 50, *reprinted in* [1975] U.S.Code Cong. & Admin.News 1480, 1503.[7] Further, it is difficult to find a state analogue which would enable the Court to characterize the nature of the federal claim. The statute speaks of "the right to bring a civil action with respect to the complaint presented pursuant to this section." 20 U.S.C. § 1415(e)(2). The legislative history specifically indicates that the House Bill's provision for *appeals* from the determinations of the state educational agency was dropped and replaced with a conference substitute creating a right to bring a civil action—the present statutory language. *See* 121 Cong.Rec. 36635–36 (1975) (Joint Explanatory Statement of the Committee of Conference). In addition, the EAHCA provides that district courts shall have jurisdiction of such actions without regard to the amount in controversy, 1415(e)(4), and shall grant such relief as the court determines is appropriate. 20 U.S.C. §§ 1415(e)(2) and (4).

Notwithstanding similarities between this federal right and a cause of action under, for example, 42 U.S.C. § 1983, the Education Act also requires exhaustion of state agency proceedings. *See* 20 U.S.C. § 1415(e)(2); *Riley v. Ambach,* 668 F.2d

---

**6.** The Rules of Decision Act, part of the Judiciary Act of 1789, states:

[T]he laws of the several states, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply. Rev.Stat. § 721 (1875). Later amended and codified at 28 U.S.C. § 1652 (1952).

**7.** The dissent seeks to construct a congressional intent by piecing together a few fragments of sentences and clauses from statements of congressmen dealing with the EAHCA legislation. However, the Supreme Court, in *Consumer Products Safety Commission v. GTE Sylvania,* 447 U.S. 102, 100 S.Ct. 2051, at 2061, 64 L.Ed.2d 766 (1980), recently warned against undue reliance on such a technique.

635 (2d Cir. 1981). Although parties may supplement the administrative record and the court is to make an independent decision based on the preponderance of the evidence, the exhaustion criterion arguably lends to the proceedings the character of a de novo appeal rather than an original action. Yet the existence of state administrative machinery need not deprive a later federal court action of its independent nature. Both Title VI and the Rehabilitation Act, whose protection significantly overlaps with that of the EAHCA, embody statutory schemes which require exhaustion of administrative remedies. *See* 45 C.F.R. §§ 80.6–80.10. The implied causes of action which courts have recognized under those statutes, however, have not been characterized as appellate in nature.[8]

Moreover, the allegedly controlling state statutes of limitations which appellants seek to rely upon are lacking in a critical dimension—they govern appeals from *state* administrative agencies to state courts and do not purport to apply to separate actions brought in the *federal* system. Past cases dealing with the appropriation of state limitations periods for federally created rights have not usually involved procedural schemes requiring exhaustion of state administrative remedies.[9] Thus, little attention has been given the need to accommodate a transfer from the state to the federal system. While Pennsylvania state courts have denominated, without further discussion, actions brought in their forums under 20 U.S.C. § 1415(e)(2) as appeals from agency decisions, they have not explicitly specified the limitation on the appeal period. *See Shanberg v. Commonwealth,* 57 Pa. Cmwlth. 384, 426 A.2d 232 (1981); *Krawitz v. Commonwealth,* 48 Pa.Cmwlth. 155, 408 A.2d 1202 (1979). Even assuming that such claims asserted in state courts have been regarded as appeals to be made within 30 days, it is not at all evident that actions brought in *federal* court should be governed by time periods deemed appropriate for appeals in the unitary state system. At a more fundamental level, when dealing with a federally created right, it is the federal courts which must decide which state limitation statute provides the proper referent. Ultimately, we must be guided by the aim of the federal statute in devising the limitation period in issue here. If state limitations law conflicts with federal procedural safeguards embodied in the Education Act, the federal concerns are paramount. *Cf. Vogel v. School Board of Montrose R–14 School Dist.,* 491 F.Supp. 989, 993 (W.D.Mo. 1980) (whenever conflict exists between procedural safeguards mandated by 20 U.S.C. § 1415 and state law, the applicable federal law is controlling).

Apparently, only one other court has undertaken to define the statute of limitations for the federal cause of action at issue here. In *Monahan v. State of Nebraska,* 491 F.Supp. 1074 (D.Neb.1980), *aff'd in part, rev'd and remanded in part on other*

---

**8.** All circuits that have ruled on the issue have found a private right of action to enforce the provisions of Section 504 of the Rehabilitation Act of 1973. *See Camenisch v. Univ. of Texas,* 616 F.2d 127, 131 (5th Cir. 1980) (en banc); *vacated and remanded on other grounds,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *NAACP v. The Medical Center, Inc.,* 599 F.2d 1247, 1258–59 (3d Cir. 1979); *Davis v. Southeastern Community College,* 574 F.2d 1158, 1159 (4th Cir. 1978); *Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977) (per curiam); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977). The Supreme Court has carefully declined to address the question. *See University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (vacating and remanding to district court for further proceedings); *Southeastern Community College v. Davis,* 442 U.S. 397, 405 n.5, 99 S.Ct. 2361, 2366 n.5, 60 L.Ed.2d 980 (1979). As for Title VI, *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) has been construed to support the existence of such a right.

**9.** *See UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966) (violation of collective bargaining agreement under Taft Hartley Act); *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946) (equity action under Federal Farm Loan Act); *O'Sullivan v. Felix,* 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914) (civil rights action under 42 U.S.C. § 1985); *Campbell v. Haverhill,* 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895) (patent infringement).

grounds, 645 F.2d 592 (8th Cir. 1981), the school district argued that a state statute requiring persons to file for judicial review of orders of the state commissioner of education within 30 days, should likewise control federal claims brought under the Education for All Handicapped Children Act, 20 U.S.C. § 1415(e)(2). The court, however, cautioned that once a state cause of action similar to the federal claim is found to exist, a court must examine whether the nature of the proceedings provided under the respective state and federal causes of action are equivalent. There, substantial disparities existed between the state and federal schemes. The state procedure involved restricted court review, limited factually to the administrative record, and limited legally to an arbitrary and capricious scope of review. In contrast, under the federal statute, parties could adduce new evidence and the reviewing court was not bound under a clearly erroneous standard to the determination of the state agency. 20 U.S.C. § 1415(e)(2). Such differences indicated that the policy considerations relevant to setting the limitation period for the state suit had no necessary application to the federal cause of action. As a result, the court believed that the 30 day state limitations period would not fully effectuate the federal policies underlying the EAHCA, and concluded that the plaintiff's claim was not time barred. 491 F.Supp. at 1084–85.

We find the reasoning of the *Monahan* court persuasive. Admittedly, the EAHCA is an integrated federal and state statutory scheme, and deference to state plans and procedures is often warranted. *See* 20 U.S.C. § 1412; *Kruelle v. New Castle County School District,* 642 F.2d 687 (3d Cir. 1981); Note, *Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975,* 92 Harv.L.Rev. 1103 (1979). But the procedural protections embodied in the Act indicate that adoption of a 30 day state appeals statute to govern the filing of a federal cause of action in a federal district court, the situation here, would be inappropriate. In explicitly providing in § 1415(e)(2) that any aggrieved party has a right to bring a *civil action* in which the reviewing court may hear evidence not contained in the administrative record and must reach an independent decision based on a preponderance of the evidence, Congress clearly contemplated more than the customary appeal from an administrative decision.[10] Moreover, the statute permits a court to "grant such relief as the court determines is appropriate," a far broader remedial power than is customarily conferred on judicial bodies reviewing agency decisions. 20 U.S.C. § 1415(e)(2). Precisely because a judicial suit under the Education Act is practically indistinguishable from the usual civil action in which issues are tried *de novo,* the state limitations statute controlling administrative appeals to state courts that appellants urge us to adopt is neither an analogous nor appropriate reference point.[11] *Cf. Ladson*

10. *See Ladson v. Board of Education of the Dist. of Columbia Gov't,* 3 Educ. Handicapped Law Report [hereinafter BHLR] 551:188 (D.D.C. March 12, 1979); *Rowley v. Board of Ed. of Hendrick Hudson Central School Dist.,* 632 F.2d 945, 948 n.5 (2d Cir. 1980); S.Rep. No.455 (Conf.Rep.) 94th Cong., 1st Sess. 50, *reprinted in* [1975] U.S.Code Cong. & Admin. News 1480, 1503.

11. Appellants actually recommend several state statutes as appropriate analogues. *See supra* at 446–447. Because all involve appeals periods of 30 days or less, we will treat them as a unit and refer to the general statute governing appeals from state agencies, Pa.C.S. 2, Subchap. A, § 701, for illustrative purposes. While a few of these statutes provide for de novo review and therefore approach the extent of judicial review contemplated in 20 U.S.C. § 1415, there are nevertheless significant distinctions. Thus, 47 Pa.Stat.Ann. § 4–464, which covers liquor license proceedings, is limited to questions of license refusals or renewals, although federal courts under § 1415 can reach issues the state agencies had no authority to address. *See Hark v. School District of Philadelphia,* 505 F.Supp. 727 (E.D.Pa.1980). Further, 47 Pa.Stat.Ann. § 4–464 confines the court to sustaining or overruling the agency decision, whereas under § 1415 the court is to sculpt the relief it deems appropriate in light of the goals of the Education Act. Only 75 Pa. Cons.Stat.Ann. § 1550 (Purdon Supp.1981–82), which applies to driver's license suspensions, appears to grant an analogously broad scope of de novo review. Of course, parties involved in such appeals do not have to adapt to a federal

v. *Board of Education of the Dist. of Columbia Gov't.,* 3 Educ. Handicapped Law Report, [hereinafter EHLR] 551:188, 189 n.4; *Monahan, supra,* 491 F.Supp. at 1084. Significantly, in confining the appeals period to 30 days, the suggested state statute would undercut in several respects the substantive and procedural protections the Congress intended to supply when enacting the federal law.

First, as the court in *Monahan* explained, when judicial review is limited to examination of the administrative record—as it is in the state statute invoked here [12]—a plaintiff can adequately prepare his case within 30 days. No investigation into evidence outside the administrative proceedings is necessary or indeed permitted. *See Monahan, supra* at 1085. Because Section 1415(e)(2) allows the presentation of additional evidence, different time considerations, accommodating the needs of parties to investigate and prepare, govern the limitations period for an action brought under the federal education statute.[13] In a recent EAHCA case before this Court the parent's principal witness in district court was a consultant for the school district who had not previously testified. While the state reviewing officer had denied the parent's request to reopen the record to permit the expert's testimony, the district judge relied

extensively on this additional evidence in reaching his decision. *See Kruelle v. New Castle County School District, supra* at 690.

Second, in providing for independent court review, Congress apparently intended to create an external check to guard against possible procedural deficiencies or institutional pressures inherent in the educational administrative system.[14] Rather than affirming, reversing or remanding an agency decision, courts are required to decide upon an educational placement which conforms to their understanding of the aims and terms of the Education Act. *Anderson v. Thompson,* 495 F.Supp. 1256, 1260–61 (E.D.Wis.1980) (role intended for court in reviewing state administrative decision is to exercise independent judgment in arriving at an appropriate placement). A limited appeals period which functions to restrict the range of evidence and issues that reviewing courts could consider would effectively dilute the independent position of the district courts envisaged by Congress. Indeed, the statutory language of Section 1415(e)(2), which permits federal or state litigation by those "aggrieved by the findings and decision" in the state administrative procedure, encompasses by its very language more than assignments of error to the findings of fact or conclusions of law made by hearing officers. As one court has aptly noted:

system after having dealt with a state system, and the issues and evidence involved may be much less complex.

**12.** *See* Pa.C.S. 2, Subchapter A, § 701. Judicial Review of Commonwealth Agency Act. Section 704, "Disposition of appeal" reads:
The court shall hear the appeal without a jury on the record certified by the Commonwealth agency. After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellants or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

**13.** Admittedly, the plaintiffs here did not find it necessary to adumbrate the record for purposes of appeal. *See* appellants brief at 12. But the specific facts of this case should not detract from the desirability of defining a single limitations period which acknowledges the needs of parties who do investigate and present new evidence in conformity with 20 U.S.C. § 1415(e)(2).

**14.** The initial bill passed by the House contained the more conventional provision that the determination of the state agency would be "conclusive in any court of the United States if supported by substantial evidence...." H.R. 7217, 94th Cong., 1st Sess., *reprinted in* H.R. Rep.No.332, 94th Cong., 1st Sess. 56 (1975) *and* U.S.Code Cong. & Admin.News, 1480, 1501. Presumably, a desire to expand the role of the reviewing court accounts for the statutory standard which Congress ultimately prescribed: proof by a preponderance of the evidence.

One may be as aggrieved by a correct interpretation of extant law or administrative authority as by unsupported findings of fact or erroneous legal analysis. It would be anomalous if, under a federal statute which contemplated recourse to the federal courts to examine state administrative decisions alleged not to fulfill the promise of a federally funded program, a deficient state administrative procedure could preclude review, especially when the gravamen of the complaint is precisely that deficiency.

*Hark v. School Dist. of Philadelphia*, 505 F.Supp. 727, 730–31 (E.D.Pa.1980).

In *Hark*, the parents placed their child in an out-of-state school, which the state hearing procedure later determined to be appropriate. Although the question of reimbursement was raised by the parents, the matter was never conclusively resolved. The parents, believing they had received a favorable ruling from the hearing officer, did not appeal to the Secretary of Education or the courts. Only when attempts to secure reimbursement failed, and the state indicated that no reimbursement procedure existed, did the parents later bring suit— 210 days after the final decision by the hearing officer. The court, reasoning that the parents neither assigned error to the rulings in the administrative proceedings nor appealed from the findings, concluded that "section 1415(e)(2) not only provides for a kind of appellate jurisdiction, but also for review whenever the plaintiff, having exhausted all applicable administrative remedies, remains 'aggrieved.' " *Id.* at 731. As *Hark* illustrates, the court's duty to insure that the state's due process mechanism

is fulfilling the Act's guarantee of a free appropriate education would be ill-served by a 30 day appeal period. Frequently, systemic deficiencies or placement problems will surface only with the passage of time.[15]

Third, the thirty day limitation period which appellants insist is controlling here would frustrate the statutory policy of co-operative parental and school involvement in placement determinations. One of the Act's important goals, which the procedural safeguards are designed to enhance, is to prevent inappropriate educational placements arising from erroneous evaluations of a child's particular needs. *See Monahan, supra* at 1085; *Lora v. Board of Education of City of New York*, 456 F.Supp. 1211, 1227 (E.D.N.Y. 1970) *aff'd in part and vac. and remanded in part*, 623 F.2d 248 (2d Cir. 1980). This purpose would not be furthered if parents were given only thirty days within which to evaluate and appeal the state secretary's decision. Moreover, the parental complaint mechanism set forth in the statutes intentionally contemplates the enforcement of the statutory rights provided by lay persons who are peculiarly subject to being unfairly penalized by a brief 30 day time bar.[16]

Much like *Hark*, the case of *Pratt v. Board of Education of Frederick City*, 501 F.Supp. 232 (D.Md.1980), highlights the need for an approach more flexible than that resulting from a 30 day appeal period. In *Pratt*, the child's mother and school authorities assented to the State Hearing Review Board's determination of an appropriate individualized educational program (IEP). No appeal was taken to any court.

---

**15.** The prophylactic role envisaged for the courts is buttressed by the legislative history. Senator Williams, the principal author of the bill stated:

> I want to underscore that exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter.

121 Cong.Rec. 37416 (1975) (Senate conference report).

**16.** Pennsylvania has recognized the desirability of parental participation and has adopted procedures to minimize the difficulties faced by parents pursuing remedies through the complaint mechanism. *See* 22 Pa.Code § 13.-32(1)(i) (notice to parent of availability of Penn. Association for Retarded Citizens and other organizations to assist in the due process hearing); 22 Pa.Code § 13.32(11) (hearing to be held at place convenient for parent). *See also Lora v. Board of Educ., supra*, 456 F.Supp. at 1241 (New York City bars school attorneys from participating in administrative hearings if parents are not represented by counsel).

Then, during the summer, as individual provisions of the IEP were being hammered out, the parties reached an impasse as a result of a ruling on disciplinary provisions by the school board. Only at that point did the mother institute suit in the federal court. Had the claim been regarded as an appeal, the child would have effectively been denied the right to an appropriate educational program; but the court accorded no significance to the delay between the initial agency decision and the court action. Rather, maintaining that the case arose under either the Education Act, 20 U.S.C. § 1401 *et seq.*, or the Rehabilitation Act, 29 U.S.C. § 794, the court premised jurisdiction on 28 U.S.C. § 1331(a). The judge stated that jurisdiction "may also exist pursuant to 20 U.S.C. ... § 1415(e)(2)," *id.* at 234, but found it unnecessary to rely on that jurisdictional base. Yet, the possibility of federal question jurisdiction in *Pratt* or, as suggested in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the availability of § 1983 actions based on the Education Act, with jurisdictional footing under 28 U.S.C. § 1343(3), argues against construing the term "civil action" in Section 1415(e)(2) as a simple appeal.[17]

While the dissent maintains that enforcing expeditiousness by a 30 day appeal period would best serve the child's educational needs, the consequences of such a rule render the expressed solicitude somewhat questionable. Few would doubt that most parents desire a prompt resolution of their child's educational placement. It is questionable though, whether barring the courtroom door after 30 days is an effective means of reinforcing this parental concern. The dissent's attempt to improve the quali-

ty of the delivery of the statutory rights would frequently produce an ironic reversal: denial of the rights altogether. Nor can the desire for promptness remove the realities of long backlogs in the court system. Insofar as proceeding through the judicial system necessarily entails delay, little appears to be gained by forcing parents to forfeit their rights if they overstep the short 30 day appeal period by a few days.

Furthermore, several of the procedural protections embodied in the statute already help to allay the inevitabilities of judicial delay. Undoubtedly, quick decisions and placements which keep pace with a child's changing needs are most desirable. But Section 1415(e)(3), the "stay put" provision—which commands that during the pendency of any proceedings, unless the school authorities and parents agree otherwise, the child shall remain in the current educational placement—at a minimum guarantees that the most recently agreed upon program cover any unresolved interims.[18] Premised on the rationale that preservation of the status quo rather than an inappropriate reaction to an emergent situation provides for the best interests of the child, this section is clearly designed to minimize the detrimental effect of delay in resolving disputes over educational programs. Thus, the "stay put" provision insures that a school cannot eject a child without complying with due process requirements. *See Stuart v. Nappi*, 443 F.Supp. 1235 (D.Conn.1978). And it guarantees consistency in a child's learning environment until a challenge to an existing placement has successfully established that

---

17. In the present case plaintiffs pleaded violations of 42 U.S.C. § 1983, the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the EAHCA. The district judge dismissed the § 1983 and Rehabilitation Act claims against the Department of Education as well as that part of plaintiff's complaint against Dr. Scanlon which sought monetary damages. However, it appears that a § 1983 claim seeking injunctive relief from Secretary Scanlon is still outstanding. Were we to find the EAHCA cause of action time-barred, the plaintiffs might arguably reassert their claims under § 1983.

18. 20 U.S.C. § 1415(e)(3) reads:

During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.

a superior alternative exists.[19] By preventing interruption and the concomitant risk of a setback in the child's development, section 1415(e)(3) undercuts the argument for a 30 day appeal period as necessary for the educational well-being of the child. Further, the proviso that courts may entertain additional evidence insures that the most recent educational needs inform the court's final decision. *See Anderson v. Thompson*, 495 F.Supp. 1256, 1261 (E.D.Wis. 1980) (because three years passed between hearing officer's decision and time of trial in federal court, all evidence presented during administrative proceeding and court action must be considered as it bears on child's current education needs).

Inasmuch as observance of a 30 day appeal period at best does little to alter the realities of court backlogs and at worst prevents aggrieved parties from redressing complex or unforeseen problems, the Court is disinclined to adopt such a truncated limitation period. The portion of the legislative history which the dissent invokes to support the desirability of prompt resolution is also tempered by the recognition that quick dispositions be "consistent with fair considerations of the issues involved." 121 Cong.Rec. 37416 (1975) (Report of Committee of Conference) (remarks of Senator Williams).[20]

While state limitations law is applied insofar as it supplements and fulfills federal policy, it would appear that the 30 day period proposed by appellants is simply incompatible with too many of the objectives of the Education Act. *Cf. UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). Post hoc application of this nonobvious time bar would clearly frustrate the federal policy of providing an appropriate education and would work severe hardship to the litigant in the case at hand as well as other young handicapped persons similarly situated.

In dealing with a cause of action arising under federal law, the state statute which is to be borrowed and how it is to be applied are federal law questions, and are determined by federal statutory policy. *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); *McClaine v. Rankin*, 197 U.S. 154, 162, 25 S.Ct. 410, 412, 49 L.Ed. 702 (1905); *Consolidated Express v. New York Shipping Ass'n*, 602 F.2d 494, 506 (3d Cir. 1979), *vacated and remanded on other grounds* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), *on remand* 641 F.2d 90 (3d Cir. 1981). Because the complaint was filed in the district court ninety days after the decision of the state educational agency, the district court found it unnecessary to decide whether a two-year or six-year statute, which together control virtually all actions in Pennsylvania, should apply. *See* Memorandum Opinion, App. at 48. For purposes of cases brought in district courts situated in Pennsylvania it would appear that the two-year state statute of limitations, which applies to actions to recover damages for injuries caused by the wrongful act or negligence of another, and controls in medical malpractice cases, is an appropriate referent. *See* 42 Pa.C.S.A. § 5524 (Supp.1981).[21] Moreover, such a time period would dovetail with Pennsylvania's requirement that a child's educational progress be reviewed at least every two

---

**19.** The statute also provides that a child applying for initial admission to public schools is entitled to be placed in the regular school program unless the parents and school agree to do otherwise. *See* 20 U.S.C. § 1415(e)(3).

**20.** Significantly, the language in the legislative history addressed to "long and tedious administrative appeals" and the need for promptness in resolving matters, appears in the context of discussions about administrative proceedings. *See* 121 Cong.Rec. 37412, 37416 (Report of Comm. of Conference) (remarks of Sens. Stafford and Williams).

**21.** While it might appear desirable to devise a uniform national time limitation to fill the statutory silence of Congress, we decline to engage in judicial legislation at this time. *See International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966) (court accepts Indiana's six-year statute of limitations for suit brought under § 301 of LMRA to recover vacation pay and refuses to create uniform federal time limitation).

years. *See* 22 Pa.Code § 13.31(c).[22] However, for present purposes, we need not decide this question.

## IV.

■ Just as congressional silence gave rise to the statute of limitations problem, the absence of clear legislative guidelines similarly accounts for the question whether CIC is a "related service." 20 U.S.C. § 1401(17). In place of the nearly inscrutable congressional intent which clouded the limitations issue, however, the statutory language and the general principles informing the Act do offer some guidance as to whether Congress intended CIC to fall within the rubric of "related services."

Under the EAHCA, a child is entitled to a "free appropriate public education" which is comprised of "special education" and "related services" designed to meet the handicapped person's unique needs. *See* 20 U.S.C. § 1401(18); *Kruelle v. New Castle County School District, supra* at 691–692. The "special education" component, which deals with the proper environment in which to educate a child, is not ultimately in issue here. *See* 20 U.S.C. § 1401(16). Few would dispute that Amber would benefit most from placement in the regular classroom. Rather, the present controversy centers on "related services"—the nature and quality of the services that the school must deliver to Amber. *See* 20 U.S.C. § 1401(17).

On the one hand, the Tokarciks contend that Amber is entitled to the CIC service because without it she could not remain and participate in the regular public school program. On the other hand, the school authorities, perhaps with an eye on budgetary and personnel constraints, argue that the CIC is not a "related service," first because

it is not connected with a special education program, and second, because it is a medical, not an educational, service. Further, the appellants insist that under Pennsylvania law, school nurses are not required to perform catheterization.

The school authorities have misconstrued the explicit statutory language. Their statutory interpretation reduces the concept of special education to "those areas of educational performance which have been adversely affected by the child's impairment," and simultaneously confines related services to "those services targeted to the special education instructional program and intertwined with it." Brief at 30. They then argue that the only special education Amber is receiving is her adaptive physical education, and claim that catheterization is in no way singularly connected to that therapy. The statute, however, is more comprehensive. It states that "special education" means "specially designed instruction at no cost to parents or guardians, to meet the unique needs of a handicapped child, *including classroom instruction*...." 20 U.S.C. § 1401(16).

Because special education specifically contemplates instruction in a regular classroom, related services necessarily include what is required within reason to make such a setting possible for a child who can benefit from it. Since an appropriate education for a physically handicapped child with a normal intellectual capacity aims at promoting achievement roughly equivalent to that of her nonhandicapped peers, special education for Amber should entail classroom instruction, for the nature of her handicap is not so severe as to preclude the possibility of education in a regular environment. *See* 20 U.S.C. § 1412(5). Such a

---

**22.** Appellants contend that all actions under 42 Pa.C.S.A. § 5524 are for damages in distinction to claims under the Education Act which generally seek prospective relief. Whether Section 1415(e)(2) implies a cause of action for monetary relief is an unresolved question. *Compare Boxall v. Sequoia Union High School Dist.*, 464 F.Supp. 1104, 1112 (N.D.Cal.1979) (court has authority to award damages) *with Loughran v. Flanders*, 470 F.Supp. 110 (D.Conn.1979) (no money damages). Courts have not hesitated to

award compensatory damages for tuition and educational expenses incurred by parents consequent to an inappropriate placement or evaluation by the state educational agencies. *See Krawitz v. Department of Education*, 48 Pa. Cmwlth. 155, 408 A.2d 1202 (1979); *Hark v. School Dist. of Philadelphia*, 505 F.Supp. 727 (E.D.Pa.1980) (permitting action for reimbursement to proceed); *Boxall v. Sequoia Union High School Dist., supra* at 1112–13 (N.D.Cal. 1979) (same).

placement would demand, in terms of related services, only that the school make the classroom physically accessible to Amber—which it has with the transportation service—and reasonably provide for health needs that might otherwise interfere with classroom performance. This is exactly what the CIC service would accomplish.

In order to avoid this natural statutory inference, appellants have enlisted an overly narrow construction of special education to support an equally constricted view of related services. They maintain that related services encompass only those services directly linked to the effort to educate and exclude any therapeutic services which, while admittedly enhancing a child's education, might also contribute to other than educational needs. Since catheterization would be necessary regardless of whether Amber were in school, such a service, under appellants' analysis, is not mandated by the Act.

Again, the statutory language would appear to foreclose this reasoning. According to § 1401(17) related services means:

> transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

A handicapped person undeniably requires or benefits from transportation, supportive services, speech pathology or occupational therapy in many contexts beyond the educational one. Since "related services" need not be education-specific and may often be critical outside the formal educational setting as well, our inquiry narrows to whether CIC is required to assist Amber to benefit from her special education.

In considering whether Congress reasonably could have intended to provide the CIC services needed to render Amber's placement in a regular class "appropriate," we are aided by the regulations which implement section § 1401(17) and clarify the definition of "related services." These regulations construe related services to include "school health services," 34 C.F.R. 300.13(a), which are further defined as "services provided by a qualified school nurse or other qualified person." 34 C.F.R. 300.13(b)(10). The district court gave meaning to these general terms by crediting the expert testimony of Dr. Lynch who considered "catheterization to be a health service, to be provided by a health professional." App. 50. In light of the district court's findings that catherization "can require no more than a few minutes a day, and either no expenditure of funds, if performed by the school nurse already required to be on the staff of every Pennsylvania school district, or very little expenditure of funds, if performed by a part-time nurse's aide," we cannot disagree that CIC properly falls within the definition of "related services" which schools must provide.

Moreover, the regulations themselves place realistic limitations on the nature of the school health services to be provided under the EAHCA. In prescribing that a school nurse be capable of rendering the services, the drastic medical services that only a doctor can perform—and which the school authorities fear they will be asked to furnish in the future—are by definition excluded.

A recent notice issued by the Department of Education reinforces this interpretation of CIC as a "related service." In fact, it explicitly states that Part B of the EAHCA, 20 U.S.C. §§ 1411–1420, and Section 504 of the Rehabilitation Act of 1973 mandate public educational agencies to provide CIC as a related service, "when it is required to provide a free appropriate public education, including services in the least restrictive environment." See Notice of Interpretation, 34 C.F.R. 104 & 300, 46 Fed.Reg. 4912 (Jan. 19, 1981). Although this interpretation presently carries no binding effect, inasmuch as the newly appointed Secretary of

Education, pursuant to an Executive Order, has postponed implementation of all recent regulations pending a review period,[23] the reasoning underlying the interpretation is similar to that employed by the district judge here. Noting that catheterization is not specifically listed as a "related service," but that the list of related services did not purport to be exhaustive, see 34 C.F.R. 300.-13, the Secretary of Education concluded that CIC was comprised in the term "school health services." The Secretary explained,

It is usually a relatively simple procedure to administer with minimal training and can be performed by a school nurse, the individual requiring catheterization, or another responsible person, none of whom need to be licensed to perform the service. Therefore, for the limited purpose of interpreting Part B [of the EAHCA] or Section 504, the Secretary does not interpret CIC to be a medical service.

46 Fed.Reg. 4913 (Jan. 19, 1981).

The Secretary derived additional support for classifying CIC as a "related service" from the directive contained in § 1412(5)(B) of the EAHCA, the mainstreaming provision, which enjoins states to facilitate "education in regular classes with the use of supplementary aids and services" to the greatest extent possible. See n.3, supra & n.24 infra; 34 C.F.R. 300.550. Under the Secretary's analysis, CIC was the very sort of "supplementary aid or service" that enables the satisfactory achievement of education in regular classes.

Two recent cases buttress the conclusion that CIC properly falls within the services to be provided under the Act. While reliance on this nascent federal "common law" aids decisionmaking under the Act and helps to eliminate the conscious ambiguity of much of the statutory language, we also recognize the danger of making inappropriate comparisons between the individualized placements and services required by children whose needs, by definition, are unique.[24] Nevertheless, children who require CIC assistance are similarly enough situated for analogies between cases to be relevant and persuasive. That is, most children who currently require CIC have spina bifida, as Amber does. And while not all children with spina bifida (1–2 per thousand births) require CIC, the vast majority are dependent upon it. See 46 Fed.Reg. 4913 (Jan. 19, 1981).

In *Tatro v. State of Texas*, 625 F.2d 557 (5th Cir. 1980), the Fifth Circuit held that CIC falls within a literal interpretation of related services. Specifically, the court held that if the words "supportive services . . . as may be required to assist a handicapped child to benefit from special education" are read literally, they must include the provision of CIC. "Quite simply put, without the provision of CIC, [the child] cannot benefit from the special education to which she is entitled, for, without CIC, she cannot be present in the classroom at all." 625 F.2d at 562. The court was also confident that the EAHCA contained its own limitations which circumscribed the types of life support systems which must be furnished as related services. Not only must the life support service be one a nurse could administer and be needed for the child to benefit from the prescribed special education, but if it could be performed solely outside school hours, it would not qualify as a related service. See 625 F.2d at 563. Although it is questionable whether "related services" *literally* included CIC, since catheterization is never specifically mentioned in the statute or the implementing regulations, *Tatro* certainly supports the proposition that such services can readily be inferred from the statutory text.

**23.** *See* 46 Fed.Reg. 12495 (Feb. 17, 1981) (postponement of effective date of interpretation pursuant to Presidential memorandum dated Jan. 29, 1981); 46 Fed.Reg. 25614 (May 8, 1981) (postponement until further notice to permit a comprehensive review of the related services requirements). The latest regulation, however, provides that CIC services be continued during the review period.

**24.** *See, e. g., Rowley v. Board of Ed. of Hendrick Hudson Central School Dist.*, 632 F.2d 945, 948 n.17 (2d Cir. 1980) (cautioning that the case was unique and not to be cited as authority in any other case).

*Hairston v. Drosick*, 423 F.Supp. 180 (D.W.Va.1976), resolved the same problem in a similar manner under the Rehabilitation Act of 1973. In *Hairston*, the school district was willing to permit a child handicapped by spina bifida to attend the regular classroom only if the mother would perform the needed catheterization. The court held that to condition the child's admission to a normal classroom on the presence of her mother was a violation of the Rehabilitation Act. Although the case was decided before many of the current regulations interpreting the Rehabilitation Act and EAHCA were published, its reasoning was not unlike the analysis proffered by the district court here: given the advantages of placement in as normal an environment as possible, to deny a handicapped child access to a regular public school classroom without a compelling educational justification constitutes discrimination and a denial of statutory benefits. *See* 423 F.Supp. at 184.

Like many cases under the EAHCA, the present conflict arises from the Act's maximum integration or "mainstreaming" requirement[25] and the school's claim that the services required to achieve that goal would cause teachers to neglect the needs of other students and divert funds from special programs most helpful to the handicapped. It should therefore be underscored that providing Amber with CIC will advance the mainstreaming principle embodied in the EAHCA in an extremely cost effective manner without adversely affecting any involved parties.

Indeed, difficult value choices between placing the burden of fiscal limitations on handicapped children as opposed to school districts, or between advantaging a handicapped child by mainstreaming rather than enhancing the education of her nonhandicapped students by excluding her, do not even confront us. The CIC service has no serious potential for disrupting the education of Amber's nonhandicapped peers. In fact, the district court found that, "Amber Tokarcik places absolutely no burden on her teacher." App. 50. Nor does it pose an undue drain on the school system's financial situation. There are simply no legitimate educational or fiscal grounds for denying Amber a right to participate in the regular classroom setting.[26]

Ultimately, providing Amber with CIC conforms to the goal of self-sufficiency on which Congress premised passage of the Act. As explained in the legislative history, "with proper education services, many [handicapped individuals] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S.Rep. 94–168, 94th Cong., 1st Sess. 9, *reprinted in* [1975] U.S.Code Cong. & Ad. News, 1430, 1433; *See Kruelle v. New Castle County School District, supra*, at 691; *Battle v. Commonwealth of Pennsylvania*, 629 F.2d 269, 279 (3d Cir. 1980) *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). In Amber's case, the chief occupational therapist at the Pittsburgh Children's Hospital, whom the school district had requested the Tokarciks to consult, recommended a therapy program for Amber which included instruction in self-catheterization. And as the Secretary of Education noted, in promulgating the agency interpretation requiring CIC, "with normal intelligence most children are able to self-cathet-

---

**25.** This directive is most clearly expressed in 20 U.S.C. § 1412(5)(B) which requires states to establish

procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the hand-

icap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily, ...

**26.** Indeed, if the school district did not have a nurse or aide available to catheterize Amber, it would still be obligated to provide her with an appropriate education. And the two possible alternatives—at home instruction or a special class for the handicapped—would appear to be less cost beneficial.

erize from approximately six to seven years of age." The majority, consequently, do not require assistance throughout their school years. By providing the CIC service, the school would thus be educating Amber to perform the service herself and helping her to become the independent, productive citizen contemplated by the Act.

## V.

Having determined that we have jurisdiction over the interlocutory injunctive order and that the action is not time barred, we affirm the order of the district court directing the provision of CIC as a related service.

ROSENN, Circuit Judge, dissenting.

The problems of a handicapped child stir our emotions, but the threshold issue of the applicable statute of limitations is so overriding that its proper resolution transcends all other considerations. I am not persuaded by Part III of the majority opinion that any policy considerations militate against application of the most analogous statute of limitations available. In the instant case, the most analogous state statute, 42 Pa.Cons.Stat.Ann. § 5571(b) (Purdon Supp.1981), prescribes a 30-day limitation period for appeals from decisions of administrative agencies. Because I believe the majority's application of a 2- or 6-year statute of limitations may be counterproductive, in the long run, to the educational development of children whose inclusion in or exclusion from a handicapped program is disputed by the child's parents or school authorities, I respectfully dissent.

## I.

My disagreement with the majority over what is an appropriate limitations period for this type of action stems from what I perceive to be significant deficiencies in the majority's analysis. The majority recognize the general rule that in the absence of a Congressionally prescribed limitations period governing assertion of federal rights, the statute of limitations applicable to analogous actions in the forum state controls.

Maj. op., 447–48. And, although the majority eschew mechanical application of the rule, relying on language in *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946), they make no pretense of following the lead of that case in establishing an independent federal limitations period for section 1415(e)(2) actions. *See* maj. op., at 454 n.21. Thus, one must assume that the majority's decision to apply either a 2- or 6-year statute of limitations results from an application of the general rule. It then becomes clear that although their opinion nowhere announces such a conclusion, the majority have necessarily decided that actions under section 1415(e)(2) are more closely analogous to original lawsuits than to appeals from administrative rulings. I cannot agree.

To the extent their opinion discloses the analysis underlying the conclusion that original actions are the appropriate state analogues to section 1415(e)(2) proceedings, the majority appear to have relied on four points. First, although an earlier version of the statute clearly referred to an "appeal" of the administrative decision, the current version authorizes aggrieved parties to bring a "civil action" for relief. Second, the statute provides that this civil action is to be conducted without any of the traditional restrictions of appellate review: evidence not introduced in the administrative proceeding may be received, any appropriate relief may be afforded, and the decision is to be based on the preponderance of the evidence. The majority also point out that other courts have held that exhaustion of state administrative remedies is not necessary before bringing a section 1415(e)(2) suit if pursuit of those remedies would be futile. Finally, the majority emphasize that, although all administrative proceedings here took place at the state level, the decision directly under review by this court was rendered in a federal forum.

As to the majority's first point—that the statutory language evinces an intent to authorize an original action rather than appeal—examination of the relevant legislative history persuades me otherwise. The

requirement that participating states establish procedural safeguards to accompany "identification, evaluation, and educational placement of handicapped children" was first imposed by the Education of the Handicapped Amendments of 1974, Pub. L.No. 93–380, tit. VI, § 614(d), 88 Stat. 484, 581 (1974). The relevant language of those amendments directed that states, when applying for federal funds to aid in education of the handicapped, include in their compliance plans "provision to insure that the decisions rendered in the impartial due process hearing ... shall be binding on all parties subject only to appropriate administrative or judicial appeal." There can be no question, then, that in its original form 20 U.S.C. § 1415 provided for judicial review of agency action only by direct appeal, not by collateral attack through an original action.

The present language of 20 U.S.C. § 1415 is derived from the Education for All Handicapped Children Act of 1975, Pub.L.No. 94–142, § 5(a), 89 Stat. 773, 788 (1975). Specifically, the language of particular moment to this case, that contained in subsection (e) of section 1415,[1] was inserted into the legislation during the conference on conflicting House and Senate versions of the Act. The conference committee offered the amendment with the following pertinent explanation:

> The Senate bill re-enacts the provisions of existing law [Pub.L.No. 93–380] relating to procedural safeguards for handicapped children and parents and guardians of handicapped children, requires their establishment as a condition of state eligibility under this part and makes ... changes to these provisions [not relevant here]....
>
> \* \* \* \* \* \*

The House bill retains the provisions of existing law relating to procedural safeguards as part of the state plan and adds the following:

> \* \* \* \* \*
>
> (6) Actions may be brought in the district courts of the United States *to appeal* the determinations of the State educational agency and in such actions the findings of fact of the State educational agency shall be conclusive if supported by substantial evidence and the district courts may remand the case to the State agency to take additional evidence.

The following conference substitute is adopted in order to clarify and strengthen the procedural safeguards in existing law.

> \* \* \* \* \*
>
> (9) The provisions of *existing law* with respect to judicial action are *clarified and strengthened* to assure that any party aggrieved by the findings and decision rendered in the due process hearing or the State educational agency review of such hearing shall have the right to bring a civil action with respect to the original complaint and matters relating thereto.

S.Conf.Rep.No. 94–455, 94th Cong., 1st Sess. 47–50, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1500–03 (emphasis added).

The conference committee's remarks thus make clear that the bills passed in each house of Congress retained the then-existing requirement that challenges to adverse state agency action be mounted by way of direct appeal. The majority's conclusion that the conference substitute created a new original federal cause of action there-

---

1. This section provides:

(a) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

fore presupposes that the conference committee completely disregarded the views of both houses, developed after extensive hearings, that direct appeal was a sufficient judicial remedy, and instead created a new, broad, general federal remedy for violations of the Act. Moreover, the majority's theory further assumes that this action was taken without the benefit of any hearings and under the guise of "clarify[ing] and strengthen[ing] the procedural safeguards in existing law." *See supra* at 449–450. Although I do not contend that such a move exceeds the authority of a Congressional conference committee, I believe that the validity of presuming such action is negated by the debate surrounding the adoption of the conference substitute.

The first observation to be made about the debates on the conference bill is that they were relatively short and consisted almost exclusively of prepared endorsements of the legislation. *See* 121 Cong.Rec. 37023–32 (1975) (House of Representatives); 121 Cong.Rec. 37409–20 (1975) (Senate). Nowhere in the debates does one find mention that fundamental alterations in the private enforcement mechanism have been effected. Indeed, the remarks of the bill's managers and sponsors indicate the contrary. Rep. Brademas, who managed the conference bill for the majority in the House, indicated to his colleagues that the conference substitute was substantially identical to the earlier House bill. 121 Cong.Rec. 37023 (1975). When commenting on the procedural section of the bill, Brademas spoke only of the administrative due process hearings to be conducted by state and local agencies, noting that "[t]his provision is similar to that adopted earlier by the House." 121 Cong.Rec. 37032 (1975). Rep. Mink, a co-sponsor of the legislation and a member of the conference committee, described the operation of the "grievance and compliance mechanism" for her colleagues, specifically explaining that "the decision on the state level can be *appealed to a State or district court.*" 121 Cong.Rec. 37031 (1975) (emphasis added).

In the Senate, Sen. Harrison Williams, the self-described "principal author of the bill," prefaced his remarks concerning the procedural provision of the conference bill with the following:

> I am enormously pleased with the action taken by the conferees with respect to protecting the individual rights of handicapped children and their parents. In the Education Amendments of 1974, the Congress adopted a series of procedural safeguards to assure that state and local educational agencies did not make inappropriate decisions regarding the identification, evaluation, and educational placement of handicapped children. And, if a child's parents disagreed with those decisions they could secure an impartial due process hearing at the State or local level and secure appropriate relief. Further, the parents or the educational agency involved could *appeal* the decision in the due process hearing *to the State or Federal Courts.*
>
> In order to strengthen these provisions, both the House and Senate bills established additional machinery through which parents could assure that their children were receiving the kind of special educational services required under this new law. However, rather than create additional mechanisms, the conferees believed that the best course of action was to refine and *build upon existing procedural safeguards.*

121 Cong.Rec. 37415 (1975) (emphasis added). The thought expressed by Sen. Williams thus echoes the concerns of Sen. Stafford, ranking Senate minority member on the conference committee, who noted the committee's recognition that most states had enacted legislation implementing the procedural safeguards of Pub.L.No. 93–380 and then continued, "[t]he conferees had no desire to have States have to act again to meet a Federal standard." 121 Cong.Rec. 37412 (1975).

Inasmuch as I find nothing in the Congressional debates to indicate that the conference committee accomplished the extraordinary change in the law which is assumed in plaintiffs' theory, I believe this court would be ill-advised to presume such

an action unless the statutory language is clear and unambiguous or cannot be reasonably understood to mean otherwise. I do not find the language of the statute to be so compelling. The use of the term "civil action," I believe, resulted from a Congressional desire to avoid confusion between the judicial appellate remedy and the administrative appellate remedy established in section 1415(c). Further, to the extent the majority consider statutorily created "civil actions" to have an inherently original function the conference committee's description of the House bill indicates a contrary understanding:

> The House bill retains the provisions of existing law relating to procedural safeguards as part of the state plan and adds the following:

> . . . . .

> (6) *Actions may be brought* in the district courts of the United States *to appeal* the determinations of the State educational agency . . . .

(Emphasis added).

The majority's second and perhaps strongest basis for analogizing 1415(e)(2) proceedings to original actions stems from the statutorily prescribed manner in which they are to be conducted. I do not dispute that to an observer not many outward distinctions may appear between these proceedings in the district court and original lawsuits. To that extent, I can agree with the majority that 1415(e)(2) suits are analogous to original actions. However, to the same extent, 1415(e)(2) proceedings are analogous to appellate proceedings brought under the following Pennsylvania statutes: Pa.Stat.Ann. tit. 47, § 4–464 (Purdon Supp. 1981–82) (de novo review of adverse agency action concerning liquor licenses);[2] 75 Pa. Con.Stat.Ann. § 1550 (Purdon Supp. 1981–

82) (de novo review of administrative denial, suspension, or revocation of driver's license);[3] and 42 Pa.Con.Stat.Ann. § 7361 (Purdon Pamphlet 1981) (de novo review of matters referred to compulsory arbitration under same section). Furthermore, these appeal proceedings are *more* analogous to 1415(e)(2) than are typical original actions because they are preceded by a series of administrative evidentiary proceedings concerning the same issue as is litigated in court. Therefore, I do not believe that the similarity in outward appearance is an adequate basis for rejecting appeals from agency action and adopting original lawsuits as the most appropriate analogies to section 1415(e)(2) proceedings.

Third, the majority place implicit reliance on other courts' use and, in certain instances, waiver of exhaustion doctrines in connection with 1415(e)(2). Of course, the very use of the term "exhaustion" loads the question whether an action is original or appellate. Exhaustion doctrines are commonly applicable to original actions brought as collateral attacks on decisions or judgments rendered in a different forum within another adjudicatory system. The most common of the exhaustion doctrines is statutorily prescribed in 28 U.S.C. § 2254 (1976), requiring that state prisoners petitioning the federal courts for writ of habeas corpus exhaust all state remedies. Only in a very loose sense of the word, if at all, can it be said that appellate actions require exhaustion of other remedies. Therefore, because I believe section 1415(e)(2) authorizes only appeals from administrative action, I do not believe that traditional "exhaustion" principles apply. Further, I find unacceptable a process by which the required steps leading to an appeal may be ignored on grounds of futility.

**2.** The majority make reference to the limited options—approval or disapproval—available to a court proceeding under this statute and then assert that a court entertaining a 1415(e)(2) suit can "sculpt" relief beyond that afforded in the administrative agency. This is a hollow distinction and results only from the nature of the issues involved: a license is either granted or denied, thus, the agency is either right or

wrong. On the other hand, planning a child's school day obviously entails making a series of decisions and adjustments, each of which is subject to approval, disapproval, or modification by the reviewing body.

**3.** *See Commonwealth v. Quinlan,* 47 Pa. Cmwlth. 214, 408 A.2d 173 (1979).

I do, however, recognize that other courts have treated actions to enforce the EAHCA as involving exhaustion principles. *See* maj. op., at 447 n.5. None of those courts, however, was called upon to decide the precise issue before us. Even in *Monahan v. Nebraska*, 645 F.2d 529 (8th Cir. 1981), it appears that the State acquiesced in the district court's resolution of the statute of limitations issue and that the Eighth Circuit therefore was not bound to address it. Without attempting to reconcile all of these cases, each with its particular facts, to my view of the statutory scheme as an appellate process, it should be noted that at least in *Loughran v. Flanders*, 470 F.Supp. 110 (D.Conn.1979), the court expressly pointed out that the action before it was based on an implied cause of action for damages under the Act. *Id.* at 113. As the majority observe in the instant case, implied private causes of action are generally original. Maj. op., at 448. To the extent the Tokarciks are attempting to avail themselves of an implied right to recover damages, therefore, my views may differ. But the majority does not address that aspect of their claim. *See* maj. op., at 455, n.22. Thus, the relevant claim on this appeal is the one predicated on section 1415(e)(2) and that action, in my opinion, is an appeal with the normal requirement that it be pursued only after all preceding stages of the procedural framework have been completed.

Finally, the majority's identification of original actions as 1415(e)(2) analogues is based on the fact that the administrative proceedings are conducted at the state level and the judicial action may be federal. This argument does not impress me. The Supreme Court of the United States hears cases from both state and federal systems and dockets both types according to the same schedule. *See* 28 U.S.C. § 2104 (1976). Further, because Pennsylvania procedure calls for section 1415(e)(2) actions to be filed in Commonwealth Court,[4] which sits only in Pittsburgh, Harrisburg, and Philadelphia, I am at a loss to understand why filing the action in the federal district courts in those same cities is more burdensome.

On the basis of the foregoing, I am constrained to disagree with my colleagues that section 1415(e)(2) proceedings are more in the nature of an original action than an appeal. I also consider their position to be inconsistent with a previous interpretation of the law by this court, *see Battle v. Pennsylvania*, 629 F.2d 269, 273 (3d Cir. 1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) ("any party aggrieved by the decision of the state agency has a right to appeal to a state court of competent jurisdiction or to a district court of the United States. [20 U.S.C.] § 1415(e)(2)"), and with the procedure adopted by Pennsylvania's Commonwealth Court, *see Shanberg v. Commonwealth*, 57 Pa.Cmwlth. 384, 426 A.2d 232 (1981); *Krawitz v. Commonwealth*, 48 Pa.Cmwlth. 155, 408 A.2d 1202 (1979).

I am also unable to accept the majority's decision because, when viewed in the context of the whole of section 1415, including 1415(e)(3)'s "stay put" provision, I believe the construction they place on the Act makes shambles of the procedural schema. Under the majority's view, the procedural protections of section 1415 are carried out in two stages. The first stage, consisting of the administrative proceedings, may be disregarded if pursuit of the remedies offered at that level would be futile. However, if some hope of relief through administrative channels exists, this level of section 1415 procedures must be followed and, during their pendency, the educational placement of the child will remain as it was when the dispute first developed, the so-called "status quo." The administrative proceedings are to be followed through to their end until a final decision is rendered by the state educational agency. This decision under the majority theory is unreviewable. The rub to such an interpretation of the statute comes when section 1415(e)(3) is applied. Notwithstanding the finality and unreviewability of the state educational agency's de-

---

**4.** *See Shanberg v. Commonwealth*, 57 Pa. Cmwlth. 384, 426 A.2d 232 (1981); *Krawitz v.* *Commonwealth*, 48 Pa.Cmwlth. 155, 408 A.2d 1202 (1979).

cision, if it differs from the status quo, it cannot be implemented until the second stage of the 1415 remedies is concluded. This second stage, according to the majority, includes at least an original federal action, and perhaps appeals, governed by a 2- or 6-year statute of limitations. The practical implications of such a construction aside, the notion that a final and unreviewable decision cannot be implemented for up to six years while awaiting collateral attack is contrary to basic Anglo-American legal theory.

I conclude, based on the relevant legislative history, the language and operation of the Act, and the absence of persuasive legal precedent to the contrary, that 20 U.S.C. § 1415(e)(2) authorizes only appeals from adverse administrative action and that the action before us must be so characterized. Having reached that conclusion, I have little difficulty identifying 42 Pa.Cons.Stat. Ann. § 5571(b) (Purdon Supp.1981) as the forum state statute governing analogous [5] state actions. Therefore, under the general rule discussed *supra* at 459–60, the Tokarciks' action was barred by the 30-day statute of limitations unless application of that statute would be "inconsistent with the federal policy underlying the cause of action." *Johnson v. Railway Express Agency,* 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975).

## II.

The majority identify three federal policies that would allegedly be undercut by application of a 30-day statute of limitations to cases of this type. First, the majority assert that a 30-day period is incompatible with the Act's provision of de novo review because it significantly limits the new evidence that can be discovered and developed before the appeal is filed.

Second, a related concern of the majority is that the resulting inability of the parties to produce for trial significant evidence not considered by the administrative bodies will diminish the reviewing court's effectiveness as an "external check" on the institutional pressures and biases to be found in state educational agencies. Finally, the majority resist imposition of a 30-day limitations period because they believe that parents and guardians who represent themselves in the administrative proceedings may be "unfairly penalized" by such an action.

As to the first two objections, I fail to see why requiring a party to file a complaint within thirty days severely restricts the evidence that will be presented at trial. First, after completion of all the formal and informal proceedings at the administrative level, one can assume that by the time the proceedings reach the appellate stage the parties will have drawn upon all the relevant evidence, and that the need for additional evidence will be exceptional. This very case is illustrative, for the trial judge relied exclusively on the administrative record and a set of stipulations. Second, in the absence of legislative provision specifically providing for priority disposition, the time lag between filing the appeal in the district court and hearing should offer ample time for development of additional evidence should that become necessary. For example, in the Western District of Pennsylvania, the case will not come to trial for at least eleven months, simply as a result of the court's backlog. Even in the case before us it was fourteen months after the complaint was filed that plaintiffs moved for and obtained summary judgment on their Education Act claim. Finally, the scope of this type of litigation is generally quite narrow. These are not complex prod-

---

**5.** The majority follow the decision of the district court in *Monahan v. Nebraska,* 491 F.Supp. 1074 (D.Neb.1980), and hold that the de novo nature of the proceeding in the district court renders it unanalogous to state appeals from administrative agencies. As I pointed out earlier in the text, however, Pennsylvania authorizes several de novo appellate actions which would, in practical terms, be indistin-

guishable from a § 1415(e)(2) action in a district court. All three Pennsylvania appellate actions to which I have referred are governed by limitations periods no greater than thirty days. In fact, both the driver's license appeals and the appeals from arbitration are controlled by the statute offered in the text as controlling the action before us.

ucts liability or patent cases. The principal issues under the EAHCA will generally concern themselves with the nature and extent of the child's disability, and proof bearing on those issues will almost always be in the form of medical opinion from a doctor or a nurse. This type of evidence should be readily available and discoverable during both the administrative stage of the proceedings and the appeal and de novo hearing in the district court. It is simply unrealistic to assume that in the rare case in which additional evidence may be necessary, a plaintiff will be unable to discover and develop it after the complaint is filed but before a trial is held.

In contrast to the majority's approach, the entire thrust and schema of the Act is to assure prompt resolution of disputes concerning the educational status of handicapped children. This is manifested in the regulations governing the administrative proceedings, which require that the formal due process hearing be completed within 45 days after it is requested, and that the review of that hearing be completed within 30 days after receipt of the request for such review. 45 C.F.R. § 121a.512(a) & (b) (1980). This call for promptness is inconsistent, in my opinion, with the majority's decision, which allows the party adversely affected by the agency decision six years to appeal it and obtain a final determination of the controversy. I also note that, during those six years, the child's Individualized Education Program will be re-evaluated at least six times, and the child will be re-evaluated at least twice. 45 C.F.R. §§ 121a.343(d), 121a.534(b) (1980). The majority's application of a multi-year statute of limitations could conceivably leave each of these re-evaluations, except for the last, in a state of suspense.

I further believe that a reviewing court's ability to function as an "external check" on administrative action under the Act derives from its broad scope of review, rather than its authority to hear new evidence.

Although the Act's language is very plain concerning the admissibility of evidence not in the administrative record, the goals of the Act—prompt and cooperative resolution of disputes—would not be well-served by an attitude reserving full preparation and exposition of the case for court proceedings.

As to the majority's third concern, that imposition of a 30-day limitation period might operate to disadvantage lay participants, it should be noted that 20 U.S.C. § 1415(b)(1)(D) requires the state fully to inform parents and guardians of the procedural avenues open to them under that section.[6] Thus, laypersons at least know that they have a right to appeal to court and, if they desire to prosecute the appeal themselves, are clearly advised by Pennsylvania's judicial code that the appeal must be filed within thirty days. Such protections, in my opinion, sufficiently minimize the danger of undue penalty as to render the 30-day statute not "inconsistent" with the federal policy of encouraging lay participation.

The final argument of the majority on this issue is that the "stay put" provision of 20 U.S.C. § 1415(e)(3) militates against application of a fairly short limitations period because it serves to maintain the child in a "second best" educational placement during the pendency of administrative and judicial proceedings. Maj. op., at 453–54. I respectfully submit that such an argument ignores the objectives of this Act and the realities of educating exceptional children.

In the final Senate debate on this legislation, Sen. Williams exhorted his colleagues as follows:

> I cannot emphasize enough that delay in resolving matters regarding the education program of a handicapped child is extremely detrimental to his development. The interruption or lack of the required special education and related services can result in a substantial setback to the child's development. Thus, in view of the *urgent need* for *prompt reso-*

---

6. The record before this court indicates that the Tokarciks received such a notice and that it informed them of their right to appeal the agency decision according to the provisions of the

Appellate Court Jurisdiction Act of 1970, the source of 42 Pa.Cons.Stat.Ann. § 5571(b) (Purdon Supp.1981–82), which provides for appeals within thirty days.

*lution* of questions involving the education of handicapped children it is expected that *all hearings and reviews* conducted pursuant to these provisions will be *commenced and disposed of as quickly as practicable* consistent with a fair consideration of the issues involved.

121 Cong.Rec. 37416 (1975) (emphasis added). I find these views to be wholly inconsistent with an interpretation of this Act by the majority that would authorize placement of a handicapped child in a "second best" educational situation for up to six years. Under such a rule, it is entirely conceivable that a child whose initial educational placement in the public schools gave rise to a dispute could spend his or her entire elementary schooling in an inappropriate program.

The majority's willingness to allow the Tokarciks to press their 1415(e) claim rests in large part on the presumed consequences to Amber if that action is found to be time-barred. However, the majority make several references to alternative remedies available to the family, at one point even appearing to imply that a finding that the 1415 action was time-barred would make no practical difference. *See* maj. op., at 453 n.17. But, there *would* be a difference; the "stay put" provision would not bar implementation of a final agency decision for six years pending collateral attack. The majority seem willing to hold that every claim that can be asserted in a section 1415(e)(2) review proceeding can be asserted in independent original actions, based on section 1983 or even on an implied cause of action under the EAHCA. Therefore, even hardship in an individual case is not a legitimate basis for allowing this 1415(e)(2) action to proceed and thereby distort unreasonably the operation of the statute.

I quite simply am unable to see any justification for prolonging any longer than absolutely necessary disputes concerning the appropriate educational placement of a handicapped child. The mere existence of the dispute is evidence that one party—either the child's parents or the schools—believes that the current placement is inap-

propriate. Thus, although the majority is perhaps correct in characterizing the status quo ante as "second best" because it was the most recently agreed upon, it still is arguably not *the* best. I am convinced that every week a handicapped child spends in an improper educational program retards his or her development, and I therefore believe that expeditiousness is indeed the key to effective administration of section 1415.

Accordingly, I would reverse the judgment of the district court and remand with instructions to dismiss the complaint insofar as it presents an appeal under 20 U.S.C. § 1415(e)(2).