Margo P. COHEN

v.

**BOARD OF TRUSTEES OF THE UNIV-
ERSITY OF MEDICINE AND DEN-
TISTRY OF NEW JERSEY; Stanley
Bergen, President, University of Medi-
cine and Dentistry of New Jersey; Vin-
cent Lanzoni, As Dean, New Jersey
Medical School, and Individually; and
Carroll M. Leevy, As Chairman, De-
partment of Medicine, New Jersey
Medical School, and Individually, Ap-
pellants.**

No. 87–5121.

United States Court of Appeals,
Third Circuit.

Argued Oct. 6, 1987.

Reargued In Banc Nov. 7, 1988.

Decided Feb. 10, 1989.

W. Cary Edwards, Atty. Gen. of N.J., Newark, N.J., Andrea M. Silkowitz, Deputy Atty. Gen. of counsel, Katherine L. Suga (argued), Deputy Atty. Gen., on the brief, for appellants.

Sterns, Herbert, Weinroth & Petrino, P.A., Trenton, N.J., Mark D. Schorr (argued), of counsel and on the brief, for appellee.

Argued Oct. 6, 1987.

Before BECKER, SCIRICA and ROSENN, Circuit Judges.

Reargued In Banc Nov. 7, 1988.

Before GIBBONS, Chief Judge, and SEITZ, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

The Board of Trustees of the University of Medicine and Dentistry of New Jersey, Stanley Bergen, president of that University, Vincent Lanzoni, dean of its New Jersey Medical School, and Carroll M. Leevy, chairman of that Medical School's Department of Medicine, appeal from a district court order, filed June 27, 1986, in the suit against them by Margo P. Cohen. In that suit Dr. Cohen, relying on 42 U.S.C. § 1983, and on New Jersey law, contends that the university, and the president, dean, and department chairman, individually, violated her constitutional and common law rights by denying her tenure on the faculty of New Jersey Medical School. The order appealed from was entered as a result of cross-motions for partial summary judgment pursuant to Fed.R.Civ.P. 56(d). (158a, appendix). Dr. Cohen also moved "for a preliminary injunction preventing defendants from removing [her] from her position with the University ... until disposition of the merits of the litigation." (150a). In relevant part, the order provides:

> ORDERED that defendants' motion for partial summary judgment be denied; and it is further
>
> ORDERED that plaintiff's motion for partial summary judgment as to the 42 U.S.C. § 1983 [claim] be granted, stating that plaintiff has a cognizable interest in tenure; and it is further
>
> ORDERED that plaintiff remain in her position until such time as a hearing be held and a determination reached that she should or should not be terminated for cause; ... [1]

(155a).

Upon the entry of this order the defendants moved for an order amending it to

---

1. The order also granted Dr. Cohen thirty days

to amend her complaint to allege class-based

include the statement pursuant to 28 U.S.C. § 1292(b) that the order involves a controlling question as to which there is a substantial ground for difference of opinion, and that an immediate appeal would advance the ultimate termination of the litigation. The district court denied the motion to amend. The defendants then filed a notice of appeal from the order "denying the individual defendants qualified immunity and enjoining the defendants from terminating plaintiff." (230a). We will reverse the order declaring that the plaintiff has a cognizable interest in tenure and enjoining the University to keep Dr. Cohen in her position until a hearing is held and a determination reached that she should or should not be terminated for cause.

## I.

### The Summary Judgment Record

The summary judgment record is sparse. It consists of Dr. Cohen's initial three-count complaint, filed on August 1, 1985, her amended eight-count complaint filed on October 9, 1985,[2] the defendants' answer to the amended complaint, filed on November 14, 1985, the defendants' motion for partial summary judgment, and Dr. Cohen's motion for partial summary judgment and a preliminary injunction, which is supported by her affidavit, to which is attached six exhibits. The exhibits include Dr. Cohen's curriculum vitae, several letters, and one minute of a meeting of the tenured faculty of the department of medicine. The parties have included in the appendix to the briefs in this court a number of other documents, including other minutes, correspondence, answers to interrogatories, the bylaws of the University of Medicine and Dentistry of New Jersey and of the New Jersey Medical School, and the Guidelines and Procedures for Appointment and Promotion of the University of Medicine and Dentistry. These other documents have not been docketed as a part of the district court record, but apparently were before the district court, probably as a part of the appendix to defendants' district court brief. The contents of that appendix were not docketed. Many of the documents are referred to in the district court's opinion, and both sides rely on them here. Since the proceedings in the district court involved both a Fed.R.Civ.P. 56(d) motion and a Fed.R.Civ.P. 65(a) motion, the other documents might have been marked in evidence during a Rule 65(a) hearing, but apparently they were not. Since, however, the parties do not dispute the authenticity of the other documents, and the trial court relied on them in deciding the parties' respective motions, we will consider them to be part of the summary judgment record without requiring any formal proceedings under Fed.R. App.P. 10(e).

That record establishes that Dr. Cohen, a diplomat of the American Board of Internal Medicine and the American Subspecialty Board of Endocrinology and Metabolism, was formerly a tenured professor at the Wayne State University of Medicine. On April 22, 1982, Dr. Leevy wrote on behalf of the department of medicine offering Dr. Cohen "appointment to the rank of Professor with a three year probationary term for tenure which is the routine now in force for the University." The letter provided that if the conditions it outlines were satisfactory, Dr. Cohen should sign and return the original copy to Dr. Leevy, who would "then forward the recommendation for your appointment to the tenured faculty in the Department of Medicine, then to the Dean, Faculty Council, and Board of Trustees." (4, 5a). Dr. Cohen signed and returned the letter.

discriminatory animus necessary for an action under 42 U.S.C. §§ 1985 and 1986, and granted her thirty days for additional discovery on the question whether there is sufficient personal involvement by Dr. Bergen to allow a recovery of money damages against him. *Id.*

**2.** The amended complaint alleges both federal question and diversity jurisdiction. To the federal claims pleaded originally, Dr. Cohen added state law claims for breach of contract, common law misrepresentation, wrongful interference with economic relations, and equitable estoppel. These diversity jurisdiction claims remain to be disposed of in the district court. So, too, do Dr. Cohen's federal claims for money damages.

On July 30, 1982, Dean Lanzoni wrote to Dr. Cohen advising her that the board of trustees approved her full-time appointment as a professor for the period August 16, 1982 through June 30, 1985. Dean Lanzoni's letter states:

> This appointment is subject to the By-Laws of the UMDNJ, the NJMS, and any other revisions thereof.

The letter requested that Dr. Cohen indicate her agreement with it by signing and returning the original to Dr. Lanzoni. She did so. In August of 1982, she moved from Wayne State to New Jersey Medical School.

On December 8, 1983, Dr. Cohen wrote to Dr. Leevy:

> In that approximately 15 months have elapsed since I joined the Faculty at the University of Medicine and Dentistry of New Jersey, it seems prudent to me to implement the necessary paper work at this time to effect tenured status on my behalf. To this end, I am therefore enclosing a copy of my updated curriculum vitae, as well as a separate list of publications and grants awarded during the interval since my appointment at the University of Medicine and Dentistry of New Jersey.
>
> I trust that you will let me know if any further information is needed so that I can supply such without delay.

(26a). Dr. Leevy responded on January 13, 1984:

> The timing and procedure for giving you tenure have been investigated. Your appointment by the Board of Trustees was June 30, 1982, and, in accordance with the three year probationary period, you will be proposed for receipt of tenure in June of 1985.

(101a). Dr. Leevy advised Dr. Cohen as to the information that should be made available to the tenured faculty in the fall of 1984. She was advised of the necessity for information on her contributions to patient care. Dr. Leevy observed that her accomplishments were "quite praiseworthy" and opined that if the faculty committee was advised of her achievements in education,

patient care, research and administration, "I am sure there will be no problem." *Id.*

On June 25, 1984, the tenured faculty in the Department of Medicine met

> to vote on a proposal that Dr. Margo Cohen, who had been appointed Professor of Medicine in the Department of Medicine with a three year probationary period for tenure, be recommended for tenure at this time.

(145a). This would have shortened the probationary period by a year. Dr. Leevy reported favorably on Dr. Cohen's research program, but noted that there were complaints from course directors about her educational activities and that there was no report on her patient care performance since she had not served as an attending physician at University Hospital. The tenured faculty voted (17–0) "that Dr. Cohen be recommended for tenure in one year." The effect of this vote was to decline to accelerate the tenure decision. After the meeting, Dr. Leevy wrote to Dean Lanzoni:

> Based on the recommendation of the tenured faculty (17–0–0) the Department plans to propose Dr. Margo Cohen for tenure during the next academic year. In a discussion by this group it was felt that Dr. Cohen is fulfilling her education and research responsibilities. Although she has served as a subspecialty consultant and physician, it was noted that Dr. Cohen has not been an attending [physician] as required of all full-time faculty in the Department each year. She is scheduled to serve in this capacity in Firm C during the month of October and this should allow her to fulfill the general medicine patient care responsibilities.

(27a). A copy of this letter was sent to Dr. Cohen.

On April 4, 1985, the tenured faculty met again to consider whether to recommend Dr. Cohen for tenure. The tenured faculty noted that there were three criteria for tenure: clinical (patient care) activities, educational activities, and research activities. While her research activities were praised, some members of the tenured faculty found deficiencies in her patient-care activities and in her teaching. The faculty voted

not to recommend Dr. Cohen for tenure. The vote was twenty-one against, two for, and one abstention. The tenured faculty then voted to recommend Dr. Cohen for a terminal year as a paid faculty member as a clinical professor of medicine. On April 15, 1985, Dr. Leevy wrote to Dean Lanzoni, with a copy to Dr. Cohen, as follows:

> Members of the tenured faculty in the Department of Medicine have reviewed Dr. Margo Cohen's activities in education, patient care and research to determine if she should receive tenure. After formal deliberations, it was concluded (2 for, 21 against, 1 abstention) that she not receive tenure. Therefore, based on consultation with the tenured faculty and their recommendation, she is not proposed for reappointment with tenure at the New Jersey Medical School.

> Dr. Cohen's current faculty appointment expires on June 30, 1985. In agreement with the tenured faculty (17 for, 1 against, 2 abstentions), it is recommended that she receive a change of title to Clinical Professor of Medicine and be given a one year terminal appointment.

(148a). Dean Lanzoni concurred in the recommendation of the department chairman and the tenured faculty.

On June 13, 1985, the board of trustees adopted the recommendation that Dr. Cohen not be granted tenure, and that she be given a one-year appointment as a clinical professor. Dr. Cohen was so advised in a June 14, 1985 letter from Dean Lanzoni. The letter notes that the appointment at clinical professor rank "does not carry tenure nor does it constitute a probationary period for tenure." (74a).

The appendix contains bylaws of both the University of Medicine and Dentistry of New Jersey (231a) and the College of Medicine and Dentistry of New Jersey. (277a).[3]

3. An explanation for the existence of two sets of by-laws is found in the unique legislative history of the University. Prior to June of 1970, Rutgers, the state university, and the College of Medicine and Dentistry of New Jersey both operated medical schools. In the Medical and Dental Education Act of 1970, 1970 N.J. Laws, ch. 102, those schools were combined in an entity called the College of Medicine and Dentistry of New Jersey. In 1981, the New Jersey legislature made several changes in the statutory charter of the combined institution, the most significant of which was to change its name to the University of Medicine and Dentistry of New Jersey. 1981 N.J. Laws, ch. 325. The authority of the University's trustees is derived from 1970 N.J. Laws, 1970 ch. 102, as amended by 1981 N.J. Laws, ch. 325, which in relevant parts provides:

> The government, control, conduct, management and administration of the university shall be vested in the board of trustees of the university.

> * * * * * *

N.J.Stat.Ann. 18A:64G–4(a) (West 1968, Supp. 1988).

> The board of trustees of the university, within the general policies and guidelines set by the Board of Higher Education, shall have the general supervision over and be vested with the conduct of the university, including its health care facilities regardless of the source of funding. It shall have the power and duty to:

> * * * * * *

> (b) Determine the educational curriculum and program of the university;

> (c) Determine policies for the organization, administration, and development of the university;

> * * * * * *

> (g) In accordance with the provisions of the State budget and appropriation acts of the Legislature, appoint and fix the compensation and term of office of a president of the university who shall be the executive officer of the university;

> (h) In accordance with the provisions of the State budget and appropriation acts of the Legislature, appoint, upon nomination of the president, such deans and other members of the academic, administrative and teaching staffs as shall be required and fix their compensation and terms of employment;

> (i) In accordance with the provisions of the State budget and appropriation acts of the Legislature, appoint, remove, promote and transfer such other officers, agents, or employees as may be required to carry out the provision of this act and assign their duties, determine their salaries, and prescribe qualifications for all positions and in accordance with the salary schedules of the Civil Service Commission whenever possible;

> * * * * * *

> (q) Adopt bylaws and make and promulgate such rules, regulations and orders, not inconsistent with the provisions of this act as are necessary and proper for the administration and operation of the university and to implement the provisions of this act;

N.J.Stat.Ann. 18A:64G–6 (West 1968, Supp. 1988). The 1970 legislation preserved the orders, rules and regulations of the pre-merger College of Medicine and Dentistry of New Jersey "until amended or repealed pursuant to

The University bylaws were adopted by its board of trustees pursuant to N.J.Stat.Ann. 18A:64G–6(q). The University bylaws provide:

Article I. Construction and Application.
Section 1. *Construction*

*1.1* These bylaws shall constitute rules of the Board of Trustees for governance of the University of Medicine and Dentistry of New Jersey (UMDNJ) as authorized by law. Nothing in these bylaws shall be construed as an infringement upon the powers and authority of the Board of Trustees or of the President. Where the faculty and administration exercise their authority to establish policy and procedures, they shall be consistent with any policy established by the Board of Trustees.

(231a).

Section 2. *Application*

*2.1* These bylaws shall apply to all units of the UMDNJ as defined in Article II, Title A, below. Each educational unit will have its own bylaws that must conform to the provisions of the University bylaws, be reviewed and approved by the Board of Trustees, and shall not be effective until so approved.

(232a). Thus the University bylaws contemplate the adoption of bylaws, consistent with those of the University, by its constituent schools.

On the subject of appointment of the academic staff, the University bylaws require that such appointments be initiated by a proposal from a department chairman (art. V, title A, section 3) and that assistant, associate and full professors be appointed by the board of trustees (article V, title B, section 2). The bylaws contemplate term appointments, for specified times depending on rank. Article V, title B, section 1. Term appointments may be renewed and the University bylaws provide:

Written notice that a term appointment is not to be renewed upon expiration is to be given to the appointee by the Dean of the educational unit concerned or his rep-

resentative as soon as possible and not less than:

(a) four months prior to the expiration of a one-year appointment;

(b) six months prior to the expiration of a two-year appointment; and

(c) twelve months prior to the expiration of an appointment longer than two years as computed from the anniversary date.

Art. V, title B, section 3.

Tenure appointments are dealt with in the University's bylaws separately from term appointments. Those bylaws first set forth the University's policy of fostering and maintaining full freedom of discussion, and academic responsibility, inquiry, teaching and research. Art. V, title C. Then tenure is dealt with as follows:

Title D. *Tenure Appointments*

Section 1. *Purpose*

Tenure may be regarded as a means to assure application of the policies set forth in Title C, above [academic freedom and academic responsibility].

Section 2. *Definition of Tenure*

Tenure is continuous academic employment until attainment of retirement age so long as the duties of the position are performed effectively, financial exigency permitting. Only the full academic rank of Associate Professor or Professor may carry tenure. Tenured appointments shall continue until terminated in accordance with the rules set forth in these bylaws.

Section 3. *Eligibility*

*3.1* The probationary period for tenured academic rank shall not ordinarily exceed seven years following appointment or promotion to the rank of Assistant Professor, including within that period full-time service in comparable institutions of higher education at the rank of Assistant Professor or above.

*3.2* All UMDNJ faculty serving as Instructors or Assistant Professors at the time of approval and adoption of this section shall have the option of including within their probationary period for ten-

law." N.J.Stat.Ann. 18A:64G–25 (West 1968, Supp.1988). The University now includes six separate schools, all health-care related, one of which is the New Jersey Medical School.

ure all service at the rank of Instructor at the UMDNJ.

*3.3* In the case of individuals whose initial appointment at the UMDNJ is at the rank of Professor or Associate Professor an initial term of appointment not to exceed three years may be specified in writing at the time of initial appointment even though thereby the faculty member's total probationary period in the academic profession is extended beyond the normal maximum of seven years. In such cases reappointment after this initial term shall be with tenure.

The University bylaws deal separately with termination of term appointees and tenured faculty members. As to the former the bylaws provide:

Term appointment may not be extended. The service of members of the academic staff having term appointments shall cease automatically at the end of their specified terms and such automatic cessation shall not be considered termination for cause within the meaning of Article VII, Title C.

Art. VII, title B, section 1. As to the latter, bylaws permit termination only for cause, after formal charges, notice, a hearing before a committee of faculty, findings, a recommendation for termination, review by the president, and action by the trustees. Art. VIII, title C.

The bylaws of the New Jersey Medical School, adopted pursuant to article I, section 2 of the University's bylaws, largely repeat the provisions of the University's bylaws with respect to appointment and tenure. As in the case of the University bylaws, the College's bylaws recognize that probationary term appointments may be made at the rank of full professor. Art. III, title B, section 1. The College bylaw dealing with the length of a probationary term appointment at that rank is identical to that of the University, quoted above. Art. III, title E, section 2.2. As with the University's bylaws, those of the College recognize that "all appointments and promotions of members of the academic staff shall be made by the Board of Trustees." Art. III, title F, section 3.1.

The College's bylaws define the duties and powers of the faculty, including:

–Formulating guidelines and procedures for appointment and promotion of faculty in accordance with these Bylaws and the CMDNJ Bylaws.

–Recommending all appointments and promotions of the faculty in accordance with these Bylaws and the CMDNJ Bylaws.

Art. II, title C, sections 1.2, 1.3. Pursuant to that bylaw, the faculty council adopted the *Guidelines and Procedures For Appointment or Promotion to the UMDNJ— New Jersey Medical School Faculty.* (28a et seq.). The guidelines and procedures describe faculty positions as follows:

1. Full Academic Rank

A fulltime faculty member is an individual who derives all of his/her professional income, exclusive of royalties, honorariums for lectures, per diem payments for service to granting agencies and similar items, from the UMDNJ—New Jersey Medical School or one of its affiliated institutions, has regularly assigned academic duties, and has completed all academic training.

a. The titles of Professor, Associate Professor and Instructor may be given to those persons who are full time at the UMDNJ—New Jersey Medical School— Persons in this category are eligible to receive tenure at the UMDNJ—New Jersey Medical School. Those in the clinical field shall also be members of the Faculty Practice Service.

\* \* \* \* \* \*

c. The titles of Professor of Clinical (specialty), Associate Professor of Clinical (specialty), Assistant Professor of Clinical (specialty), and Instructor of Clinical (specialty) may be given to certain members of the clinical faculty whose principal duties are encompassed by clinical service and/or patient care and teaching. It is expected that, because of the nature of their duties, such members of the faculty will have minimal interest and/or minimal time to fulfill research qualifications necessary for the

tenure track appointments and promotions.

\* \* \* \* \* \*

Faculty members in this track will not receive tenure nor will they participate in departmental affairs designated as the privileges and duties of tenured faculty. They will have, however, all of the other rights and privileges of tenure track faculty members of similar rank.

Thus the guidelines and procedures recognize a distinction between tenure track and clinical appointments. In both of the categories, however, the same four ranks are recognized. Criteria for each of these ranks is set forth in the guidelines and procedures. The description of the rank of professor is set forth in article I, section B(1)(c) of the guidelines and procedures, and that description includes the sentence:

Appointment or promotion to the rank of Full Professor is a tenured rank and demands distinguished academic achievement.

Viewed in its entirety, the guidelines and procedures document appears to delineate standards for the faculty's participation in the appointment and tenure process. As appears from the governing statute and the bylaws of the University and College, that participation involves making recommendations, not conferring status.

## II.

### The District Court Ruling on Dr. Cohen's Motion

As noted above, Dr. Cohen's original complaint pleaded three federal law counts. These are predicated on 42 U.S.C. § 1983, and all seek reinstatement, and punitive and compensatory damages. The third count, which incorporates the allegations of the first two, alleges a conspiracy to deprive Dr. Cohen of the constitutional rights to which those counts refer. The first two allege the deprivation of property without procedural due process. As with all procedural due process claims, they refer to a source of positive law which creates the

protected property interest. In Count I, Dr. Cohen alleges that although she accepted a probationary three-year appointment in 1982, she in fact became tenured as a matter of New Jersey law. In advancing that contention she relies on the provision in article I, title B, section (1)(c) of the guidelines and procedures, quoted in Part I above. In Count II, Dr. Cohen alleges that if in fact she did not become tenured as a matter of law upon her initial appointment, she became tenured as a matter of New Jersey law when the trustees appointed her as a clinical professor at the end of her probationary term. In advancing that contention she relies on the University bylaw, article V, title D, section 3.3, quoted in Part I above.

In her amended complaint, Dr. Cohen added five additional counts, all of which allege claims under New Jersey law.[4] One of the added state law counts, Count IV, alleges that the guidelines and procedures on which she relies in her first count became terms and conditions of her employment. Thus Count IV alleges the same state law property interest on which her procedural due process claim in Count I is predicated.

In moving for partial summary judgment, Dr. Cohen relied only on her federal law counts. In her affidavit in support of that motion she reiterated the theories of tenure pleaded in Counts I and II. In addition, she added a new legal theory not theretofore pleaded that because she did not receive a timely notice of non-renewal of her probationary term appointment, she was automatically reappointed with tenure. In advancing this theory, she relied on the University bylaws, article V, title B, section 3(c), quoted at Part I above.

The district court, in granting partial summary judgment pursuant to Fed.R.Civ. P. 56(d), held that Dr. Cohen became tenured automatically because she did not receive timely notice of non-renewal of her probationary term appointment. Alterna-

---

**4.** After the district court's ruling on her motion, Dr. Cohen filed a second amended complaint. Still later she filed a supplemental complaint adding three additional counts. These pleadings were not addressed in the decision we review.

tively, the district court advanced a fourth legal theory, that even if she had not become tenured, the text of Dean Leevy's letter advising her that she would be recommended for tenure in 1985 created a legitimate expectation that she would be tenured unless she received notice of her deficiencies, a hearing, and an opportunity to cure them. The district court rejected Dr. Cohen's claim that her initial appointment was to a tenured position and her claim that the one-year appointment as a clinical professor gave her tenure as a matter of law.

The district court also concluded that because under New Jersey law a contract between a university and a tenured faculty member was an exception to the general rule that contracts for the performance of personal services are not specifically enforceable, an injunctive order should issue requiring that the University retain Dr. Cohen unless and until she was afforded a hearing in which it could be determined that she could be terminated for cause.[5]

### III.

### The District Court Ruling On The Defendants' Motion

Like Dr. Cohen, the defendants moved for partial summary judgment on her federal counts. The University contended that relief against it was barred by the Eleventh Amendment, and that in any event Dr. Cohen had no state law property interest on which her due process claim could rest. The individual defendants contended that her section 1983 claim against them for money damages should be dismissed as a matter of law because they enjoyed qualified immunity. The district court held that the University was not protected by the Eleventh Amendment. In granting partial summary judgment in favor of Dr. Cohen, it ruled against the University on the merits of her section 1983 claim, at least to the extent of ordering that she be retained as a faculty member. In rejecting the individual defendants' qualified immunity defense, the district court concluded that they should have known that Dr. Cohen had a legally protected interest in tenure which could not be terminated without due process.

### IV.

### Appealability

Dr. Cohen contends that the order appealed from is interlocutory, and thus the appeal should be dismissed. Since there are numerous claims still pending, including her section 1983 claim for money damages, that order is not a final judgment within the meaning of Fed.R.Civ.P. 54(b). It could not have been certified under that rule so as to permit execution and appeal. *See Marino v. Nevitt,* 311 F.2d 406, 408 (3d Cir.1963); *International Controls Corp. v. Vesco,* 535 F.2d 742, 747–48 (2d Cir.1976). Indeed, in a strict sense it is not a judgment at all, since the court acted pursuant to Fed.R.Civ.P. 56(d) (case not fully adjudicated on motion) rather than Rule 56(c) (summary judgment for claimant). As a leading commentator notes:

> The procedure prescribed in subdivision (d) is designed to be ancillary to a motion for summary judgment. However, unlike the last sentence in Rule 56(c), which provides an interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. It simply empowers the court to withdraw some issues from the case and to specify those facts that really cannot be controverted.... Inasmuch as it narrows the scope of the trial, an order under Rule 56(d) has been compared to a pretrial order under Rule 16.

(Footnotes omitted). 10A Wright, Miller & Kane, Federal Practice and Procedure, § 237, 457–58 (1983). Thus we agree with Dr. Cohen that the order is not appealable under 28 U.S.C. § 1291. The University does not contend otherwise.[6]

**5.** The court relied on *American Ass'n of Univ. Prof. v. Bloomfield Col.,* 136 N.J.Super. 442, 346 A.2d 615 (App.Div.1975), *aff'g,* 129 N.J.Super. 249, 322 A.2d 846 (Ch.Div.1974).

**6.** The individual defendants rely on section 1291. Their contention is dealt with at Point VI, *infra.*

The University, however, points to the provision in the order requiring them to reinstate Dr. Cohen to a faculty position. This, the University contends, is an injunctive order, and thus appealable under 28 U.S.C. § 1292(a)(1).[7]

Dr. Cohen advances two contentions in support of her position that the order is not appealable under section 1292(a)(1). The first is that even if it is an injunction, section 1292 does not authorize an appeal unless the appellant can show irreparable harm. The second is that the order is not injunctive within the meaning of section 1292(a)(1). In support of the first contention she relies on *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). In support of the second contention Dr. Cohen relies on *United Bonding Insurance Co. v. Stein*, 410 F.2d 483 (3d Cir.1969) (per curiam), and *Saber v. Financeamerica Credit Corp.*, 843 F.2d 697 (3rd Cir.1988).

■ For the reasons which follow, we reject both contentions, and hold that the order is appealable under section 1292(a)(1). We start with the plain language of that section. It says that the courts of appeals shall have jurisdiction of appeals from:

Interlocutory orders ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve injunctions....

The statutory language is in no way qualified by any irreparable injury requirement. If an order is injunctive, even though interlocutory, it is immediately appealable. Thus our first task is to define injunctions for purposes of that statute.

■ Not every order which may be enforced against a party by civil contempt is such an injunction. For example, an order entered against a party solely to enable another party to gain discovery, though enforceable by civil contempt, does not fall under section 1292(a)(1). *Metex Corp. v. ALS Industries, Inc.*, 748 F.2d 150, 156 (3d Cir.1984). So too, an order imposing the sanction of preclusion of evidence for failure to make discovery, does not fall under section 1292(a)(1), even though it makes the likelihood of issuance of an injunction more or less likely. *Cromaglass Corp. v. Ferm*, 500 F.2d 601, 608 (3d Cir.1974). Moreover, an order staying or refusing to stay an action for equitable relief does not fall under section 1292(a)(1), even though it postpones or accelerates resolution of an action seeking injunctive relief. *Gulfstream Aerospace Corp. v. Mayacamas Corporation*, 485 U.S. 271, ——, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988); *Switzerland Cheese Association v. E. Horne's Market*, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed. 2d 23 (1966). Finally, orders attaching security for a judgment ultimately to be rendered have been held not to fall under section 1292(a)(1), even though such orders have a significant impact on the parties whose property is affected. *See Schoenamsgruber v. Hamburg American Line*, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989 (1935); *Rosenfeldt v. Comprehensive Accounting Service Corp.*, 514 F.2d 607, 609–10 (7th Cir.1975); *Financial Services Inc. v. Ferrandina*, 474 F.2d 743, 745–46 (2d Cir.1973). These exceptions to the reach of section 1292(a)(1) serve, negatively, to define injunctions for purposes of that section. What they have in common is that in each case the order in question, while significant, does not either grant or deny the ultimate relief sought by the claimant.

■ Conversely, when a claim seeking injunctive relief is dismissed, even on jurisdictional grounds, the effect of such a dismissal is to deny the ultimate equitable relief sought by the claimant, and the order is appealable under section 1292(a)(1). *General Electric v. Marvel Rare Metals Co.*, 287 U.S. 430, 53 S.Ct. 202, 77 L.Ed. 408 (1932); *Lair v. Fauver*, 595 F.2d 911 (3d Cir.1979).

■ In actions at law, Fed.R.Civ.P. 56(c) can produce final adjudications of part of a

---

**7.** In granting reinstatement, the order has the appearance of granting some of the permanent relief requested by Dr. Cohen. Because section 1292 covers all injunctive orders, determining whether this order is a preliminary injunction or a permanent injunction is not relevant to our inquiry. The order is in either event interlocutory.

whole lawsuit. If a distinct claim is fully adjudicated, the district court can direct the entry of a final judgment pursuant to Fed. R.Civ.P. 54(b).[8] If that is done, the party in whose favor the judgment is entered can obtain execution pursuant to Fed.R.Civ.P. 69(a) which authorizes execution only "to enforce a judgment for the payment of money." Conversely, the losing party may appeal, pursuant to section 1291, and may obtain a stay of execution by filing a supersedeas bond pursuant to Fed.R.Civ.P. 62(d). In such cases, section 1292(a)(1) need have no application. If an action at law is only partially adjudicated on the merits under Fed.R.Civ.P. 56(d), on the other hand, no form of the affirmative relief requested by the claimant, either by execution or by contempt, is available. In such a case, there is ordinarily no appealable order under either section 1291 or section 1292(a)(1). The chief distinction between actions at law and actions in equity seeking injunctive relief, thus lies in the mode of execution. Equity acts on the person, who can be held in contempt for noncompliance. Actions at law for the recovery of money, on the other hand, can only be enforced by execution after final judgment. This distinction further defines what is an injunction for purposes of section 1292(a)(1). The order must not only adjudicate some of the relief sought in the complaint; it must also be of such a nature that if it grants relief it could be enforced pendente lite by contempt if necessary. Wright, Miller, Cooper & Gressman, *Federal Practice & Procedure*, § 3922, 29 (1977).[9]

Congress initially created this exception to the final judgment rule because it thought serious consequences might result from compliance with injunctive orders during the pendency of litigation. The Supreme Court has stated:

> The manifest intent of this provision, read in light of the previous practice in the courts of equity of the United States, contrasted with the practice in courts elsewhere, appears to this Court to have been ... to permit the defendant to obtain immediate relief from an injunction, the continuance of which throughout the progress of the cause might seriously affect his interests. ...

*Smith v. Vulcan*, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897). When *Smith v. Vulcan* was written, the predecessor to § 1292(a)(1) only applied to the grant or continuation of an injunction by an interlocutory order. Evarts Act ch. 517, § 7, 26 Stat. 828 (1891). Since then, Congress has determined that denials and modifications of injunctive orders also present serious consequences justifying interlocutory appeal. The proper sphere of legislative competence and limits on judicial power has been set out by the Supreme Court:

> The Congress is in a position to weigh the competing interests of the dockets of the trial and appellate courts, to consider the practicability of savings in time and expense, and to give proper weight to the effect on litigants. When countervailing considerations arise, interested parties and organizations become active in efforts to modify the appellate jurisdiction. This Court, however, is not authorized to approve or declare judicial modification. It is the responsibility of all courts to see that no unauthorized extension or reduction of jurisdiction, direct or indirect, occurs in the federal system.

*Baltimore Contractors v. Bodinger*, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955).

> Orders that are directed to a party, enforceable by contempt, and designed to accord or protect "some or all of the substantive relief sought by a complaint" in more than a [temporary] fashion.

Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure*, § 3922, at 29 (1977) (*citing International Products Corp. v. Koons*, 325 F.2d 403, 406 (2d Cir.1963)); *I.A.M. Nat'l Pension Fund v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C.Cir.1986) (adopting test verbatim).

---

**8.** Dr. Cohen's claim has not been fully adjudicated because her request for damages has not been determined. *International Controls Corp. v. Vesco*, 535 F.2d 742, 747–48 (2d Cir.1976).

**9.** Thus far, injunctions have been defined negatively by delineating orders that are not injunctive. For purposes of 28 U.S.C. § 1292(a)(1), injunctions may be affirmatively defined as follows:

When a claimant makes a Fed.R.Civ.P. 65(a) motion for a preliminary injunction, and the court expressly rules on it, there is no difficulty in identifying the order as falling within section 1292(a)(1). Such explicit orders must fall within the plain language of the section. *See Baltimore Contractors v. Bodinger*, 348 U.S. 176, 182, 75 S.Ct. 249, 253, 99 L.Ed. 233 (1955) ("The appealability of routine interlocutory injunctive orders raised few questions. *See George v. Victor Co.*, 293 U.S. 377, 55 S.Ct. 229, 79 L.Ed. 439 (1934). There the statute was clear.").

Difficulties have arisen, however, in cases where the pleadings and the court's order are less explicit. In such cases, the Supreme Court has looked to find if the interlocutory order presents "serious, perhaps irreparable consequences" justifying classification of the order as one falling within § 1292(a)(1). *See, e.g., Carson v. American Brands, Inc.*, 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981) (interlocutory orders which merely have the practical effect of denying an injunction are appealable pursuant to § 1292(a)(1) only if the litigant can demonstrate that the order might have a "serious, perhaps irreparable consequence" and that it can be "effectually challenged" only by an immediate appeal). The appealability of grants of injunctive orders in whatever form has not been called into question by this line of cases. If the order grants part of the relief requested by the claimant, the label put on an order by the district court does not prevent the appellate tribunal from treating it as an injunction for purposes of section 1292(a)(1). *Sampson v. Murray*, 415 U.S. 61, 86–87, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 182, 75 S.Ct. 249, 253, 99 L.Ed. 233 (1955); *Tokarcik v. Forest Hills School District*, 665

F.2d 443, 447 (3d Cir.1981) ("Notwithstanding the *Carson* qualification that interlocutory orders pose 'serious perhaps irreparable consequences,' the appealability of a routine interlocutory injunctive order remains unquestioned.").[10] "There should be no doubt that an injunction has been 'granted' by an order that takes immediate effect." Wright, Miller, Cooper & Gressman, *Federal Practice & Procedure*, § 3924, 69 (1977). What is determinative is that the order *can* be immediately enforced.

Greater difficulty arises, however, in cases where the court has entered an order denying relief, not explicitly identified as the denial of a preliminary injunction, but an appellant attempts to characterize it as such because the order has the indirect effect of denying injunctive relief. The Supreme Court has dealt with this situation in *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). The district court in *Carson* denied a motion to enter a proposed consent decree in a Title VII action. 446 F.Supp. 780 (E.D.Va. 1977). The consent decree would have provided injunctive relief. The court of appeals dismissed the appeal. 606 F.2d 420 (4th Cir.1979). The Supreme Court reversed, holding that although the order was not made pursuant to Rule 65(a) and thus did not formally deny a preliminary injunction, it had the effect of denying injunctive relief and it had such serious, perhaps irreparable, consequences, that it should nevertheless be treated as an order refusing an injunction within the meaning of section 1292(a)(1). The court relied on *General Electric v. Marvel Rare Metals Co., supra*, 450 U.S. at 83, 101 S.Ct. at 996. It distinguished *Switzerland Cheese Association v. Horne's Market, supra*, on the

**10.** After holding that injunctive orders fell clearly within the express terms of § 1292(a)(1) and that a separate or additional showing of "serious, perhaps irreparable harm" was not necessary to find appellate jurisdiction, this court noted that the defendants *claim* irreparable harm. 665 F.2d at 447 ("And defendants claim irreparable harm insofar as this additional responsibility to furnish what they regard as

medical services will diminish their ability to fulfill what is more appropriately within their domain and expertise—the education needs of handicapped children."). The court did not find or rely upon the existence of irreparable harm in determining that there was appellate jurisdiction over the injunctive order pursuant to 28 U.S.C. § 1292(a)(1).

ground that in *Switzerland Cheese* no Rule 65(a) motion had been made, and the denial of a motion for summary judgment, which did not foreclose a subsequent Rule 65(a) motion, did not cause serious, perhaps irreparable, consequences. 450 U.S. at 85, n. 10, 101 S.Ct. at 997, fn. 10.

Dr. Cohen relies on *Carson* for the proposition that an order granting Rule 65(a) relief is appealable only if the appellant shows serious, perhaps irreparable, consequences, from its entry over and above the fact that the grant of part of the relief requested by the claimant is immediately enforceable by contempt. That reading of *Carson* is not supportable. The Supreme Court's discussion of the need for a showing of serious, perhaps irreparable, consequences is set forth not in a case where an order was entered granting part of the relief requested by the claimant, but in a case in which such relief was tacitly denied. *Carson* thus did not address the situation where either an explicit Rule 65(a) order or an order designated as something else, actually grants part of the relief requested in a form immediately enforceable by contempt. It is set forth, moreover, not in a case in which the district court explicitly denied a Rule 65(a) motion, but rather in a case in which the appellant wanted another order treated as if it were such a denial. *Carson* therefore is a door opening, not a door closing decision.

This analysis is not inconsistent with this court's prior determination in *McNasby v. Crown Cork & Seal Co., Inc.,* 832 F.2d 47 (3d Cir.1987). *McNasby* involved an order granting partial summary judgment, which was not denominated a Rule 65(a) injunction. It involved a classic example of Rule 56(d) relief—a determination, for purposes of further proceedings in the case, that the defendants' job classification system and seniority system violated the law. This court, citing *Carson*, rejected the appellants' effort to have a Rule 56(d) order, granting partial summary judgment which granted no relief enforceable pendente lite, treated as a section 1292(a)(1) injunction.

The discussion in *McNasby* of the need for showing serious, perhaps irreparable, consequences, is consistent with *Carson*, since it deals with an effort to treat a Rule 56(d) order, not immediately enforceable by contempt, as if it was a Rule 65(a) order. That may only be done if the Rule 56(d) order satisfies the *Carson* test.

*Saber v. Financeamerica Credit Corp.,* 843 F.2d 697 (3d Cir.1988), may similarly be reconciled with our present analysis in that *Saber* also involved an interlocutory legal order which was not enforceable pendente lite upon pain of contempt. *Saber* was not an action in equity, but an action for the recovery of money. The *Saber* court reasoned:

> The district court ordered the payment of money in response to the alleged settlement of a traditional claim for damages in tort. An award of monetary compensation is not transformed into an injunctive remedy merely by a district court's imposition of a time limit on the defendants' obligation to pay.

843 F.2d at 702–03. The *Saber* holding, therefore, is that in an action at law for money damages, a Rule 56(d) order adjudicating less than the whole dispute is simply not enforceable pendente lite, even when the court imposes a time limit for payment. Absent a Rule 54(b) determination no writ of execution could issue, and money judgments are not enforceable by contempt. Thus the *Saber* court properly concluded that the appellant could not appeal under section 1292(a)(1). Consistent with *Carson*, the order appealed from, since it was not enforceable pendente lite, did not involve any significant immediate consequences, and should not have been treated like an injunction.

Thus we reject Dr. Cohen's first contention that when an injunction is specifically applied for and granted, the party enjoined must show some irreparable injury beyond that resulting from the availability of pendente lite enforcement by contempt in order to appeal under section 1292(a)(1). *See Smith v. Vulcan,* 165 U.S. 518, 525, 17

S.Ct. 407, 410, 41 L.Ed. 810 (1897); *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 182, 75 S.Ct. 249, 253, 99 L.Ed. 233 (1955); *Tokarcik v. Forest Hills School District*, 665 F.2d 443, 447 (3d Cir.1981).

■ Dr. Cohen's second contention, that an order granting specific performance of a contract is not an injunction for purposes of section 1292(a)(1), depends upon language in the per curiam opinion in *United Bonding Insurance Co. v. Stein*, 410 F.2d 483, 486 (3d Cir.1969); language repeated as dicta in *Saber v. Financeamerica Credit Corp.*, 843 F.2d at 702. The actual holding in *United Bonding* may be that an order requiring the posting of security for a judgment which may later be rendered is not appealable under section 1292(a)(1), an issue not presented here. *United Bonding* relied on Judge Friendly's opinion in *Taylor v. Board of Education*, 288 F.2d 600, 604 (2d Cir.1961), for the proposition that "not every order containing words of command is a mandatory injunction within section [1292(a)(1)]," and *Taylor* is a good illustration. It involved an attempt to obtain pendente lite review of a liability determination in a school desegregation suit prior to the time that any enforceable desegregation order was put in place. To the extent that *United Bonding* stands for the proposition that such Rule 56(d) determinations are not appealable it is sound, so long as the order is not enforceable by contempt. If it deals only with security pendente lite it may be sound. But to the extent that it suggests that an order granting specific performance of a contract, a form of relief sought by the claimant, can be enforced pendente lite by contempt, but is not appealable under section 1292(a)(1), we expressly disapprove that suggestion, and hereby overrule it.[11] At least since *Penn v. Lord Baltimore*, ch. 1750, 1 Vesey

Senior 444, specific enforcement of contractual undertakings by an order against the person has been regarded as a classic form of equitable relief. It is a form of relief available under Fed.R.Civ.P. 65(a), and if it is granted the order falls within section 1292(a)(1).[12]

■ In this case, Dr. Cohen's motion explicitly requested a preliminary injunction. The district court granted that request by ordering the University to restore her to her position, and to retain her until such time as she is removed for cause in the same manner that tenured faculty members are removable. That provision of the June 27, 1986 order is an order granting an injunction within the meaning of section 1292(a)(1), and we have appellate jurisdiction. In granting injunctive relief, the district court relied on her Rule 56(d) liability determination. Thus that determination is inextricably bound up in our review of the injunction, and must be addressed. *Smith v. Vulcan Iron Works*, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897); *Kirshner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir.1982) (in banc).

## V.

### The Merits of The Tenure Ruling

We turn, therefore, to the merits of the tenure ruling. Both sides moved for a Rule 56(d) partial summary judgment on the question whether Dr. Cohen had a protectable property interest which would trigger section 1983 procedural due process rights. Both sides agree that all relevant facts were placed before the court for the determination of that legal question. Our review of that legal issue is, of course, plenary. We must address not only the two legal theories on which the district court relied, but since they might afford a

---

**11.** To the extent that *Firemans Fund Ins. Co. v. Myers*, 439 F.2d 834 (3d Cir.1971), adopts this reasoning, it too is hereby overruled.

**12.** *Firemans Fund Ins. Co. v. Myers, supra,* and *United Bonding Ins. Co. v. Stein, supra,* have been criticized for drawing a distinction be-

tween interlocutory orders to specifically perform monetary obligations (orders directing the immediate payment of money) and injunctions, for purposes of appeal under § 1292(a)(1). *See* Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure,* § 3922, at 45–46 (1977).

separate ground for affirmance, the two legal theories which that court rejected.

■ The district court properly rejected Dr. Cohen's Count I contention that her initial appointment was with tenure. That contention is predicated on descriptive language in the faculty council's guideline and procedures to the effect that appointment or promotion to the rank of full professor is a tenured rank. Elsewhere the same document recognizes, however, that non-tenured appointments may be made at that rank, and the University bylaws, which are in any event controlling, also so provide. Dr. Cohen was advised that her initial appointment was for a probationary three-year term and she accepted that appointment. She did not obtain tenure on her initial appointment.

■ The district court also rejected Dr. Cohen's Count II contention that her appointment as a clinical professor for a one-year term resulted in tenure. The University bylaws expressly authorize term appointments for clinical professorships. The faculty, Dr. Leevy and Dean Lanzoni recommended such an appointment, the trustees tendered such an appointment, and until she took a leave of absence, Dr. Cohen accepted it by serving in the medical school in that capacity. In advancing the contention that she nevertheless obtained tenure, Dr. Cohen relies on article V, title D, section 3.3 of the University bylaws, which says in part that "reappointment after this initial term shall be with tenure." Her reading of that language in section 3.3, however, wrenches it from its context. The purpose of the clause is to conform the University's procedures on grant of tenure with those recommended by the American Association of University Professors in its 1940 Statement of Principles on Academic Freedom and Tenure. That Statement, to which most institutions of higher education subscribe in whole or in part, suggests that for tenure track appointments the tenure decision must be made within a specific time. For professors like Dr. Cohen, who have had prior academic experience in a tenure or tenure track position and move to a new university, the tenure decision at the new university must be made within three years. In this case it was. Under the bylaws, consistent with the Statement of Principles on Academic Freedom and Tenure, the decision could not have been made after the expiration of three years. A clinical professorship, under the bylaws, is a term appointment and, as the correspondence from Dean Lanzoni makes clear, is not either the grant of tenure or the extension of a tenure track appointment.

■ The district court erred, however, in relying on article V, title B, section 3(c) as support for the conclusion that Dr. Cohen obtained tenure by default. That notice of non-renewal provision has nothing to do with tenure. The appointments of tenured faculty members are not renewed. They last until retirement. The notice of non-renewal deals only with non-renewal of term appointments. The obvious purpose of the notice of non-renewal provision in article V, title B, section 3(c) of the University's bylaws is to afford to persons holding only term appointments a reasonable notice that they should seek other employment. Even if Dr. Cohen's probationary term had expired and she was given no additional term of employment, the most to which a failure of notice would entitle her would be money damages for breach of the notice provision in her term employment contract. In fact, however, the University fully complied with article V, title B, section 3(c) by giving her notice in Dr. Leevy's April 15, 1985 letter that she would not be recommended for tenure, and by accompanying the June 13, 1985 decision of the trustees with a one-year term appointment, which she accepted. Thus she does not have any claim for damages for breach of the notice provision. She was afforded the one-year notice that she should seek other employment specified in article V, title B, section 3(c).

■ The district court also erred in holding, alternatively, that Dr. Leevy's June 25, 1984 letter addressed to Dean Lanzoni, with a copy to Dr. Cohen, created a state law property expectation in tenure. The letter, read in context, does no more than advise her that the faculty would not accelerate the tenure decision by shortening the probationary term. It also makes plain that the faculty was not yet satisfied that she had fulfilled all the requirements for tenure. The "plans to propose" language on which the district court focused does not reflect a firm commitment to recommend her for tenure. Even if it did, the bylaws are perfectly clear with respect to the role of the faculty. It could only recommend. Thus as a matter of law, the letter could not give rise to any legitimate expectation under New Jersey law that the faculty could bind the board of trustees.

Thus none of the legal theories advanced by Dr. Cohen or by the district court in support of the existence of a state law property interest which would trigger federal procedural due process protections has any merit. Rather, it is clear that as a matter of law, partial summary judgment on her section 1983 claims should have been entered against her rather than in her favor. She has not pleaded a valid section 1983 claim and cannot prove one.

## VI.

### The Qualified Immunity Contention

President Bergen, Dean Lanzoni and Dr. Leevy contend that the court erred in denying their motion for summary judgment on qualified immunity grounds, and that their appeal is cognizable under section 1291 as well as section 1292(a)(1). We need not—indeed should not—address these questions, because these individual defendants can derive no significant benefit from our pronouncement about them. We have held in Part V that Dr. Cohen has not pleaded and cannot prove a valid section 1983 claim. Obviously, therefore, she cannot recover damages from the individual defendants under section 1983. None of her other causes of action are before us on this appeal. Our disposition of the section 1292(a)(1) appeal fully protects the individual defendants against the section 1983 claims as to which qualified immunity was pleaded.

## VII.

### Conclusion

We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The order directing the University to retain Dr. Cohen in her position until such time as a hearing is held and a determination made that she should or should not be terminated for cause, predicated on the district court's erroneous Rule 56(d) determination that she has a protectable property interest in University tenure, will be reversed, and the case remanded to the district court for the entry of a Rule 56(d) order in favor of the defendants on her section 1983 due process claims.